IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

JAY HEATH, EDWARD SHAPIRO, and DAISY BECERRA LOPEZ, individually and on behalf of all similarly situated persons,

Plaintiffs,

v.

INSURANCE TECHNOLOGIES CORP. and ZYWAVE, INC.,

Defendants.

Case No. 3:21-cv-01444-N

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT**

# TABLE OF CONTENTS

**SECTION:** **PAGE:**


TABLE OF CONTENTS ..... ii

TABLE OF AUTHORITIES ..... iv

I. INTRODUCTION ..... 1

II. CASE SUMMARY ..... 2

A. The Data Incident ..... 2

B. Procedural Posture ..... 3

III. SUMMARY OF SETTLEMENT ..... 4

A. Settlement Benefits ..... 4

1. Tier One Relief ..... 6

2. Tier Two Relief ..... 7

3. Tier Three Relief ..... 8

B. The Notice and Claims Process ..... 8

1. Notice ..... 9

2. Claims ..... 9

3. Requests for Exclusion and Objections ..... 11

C. Plaintiffs' Service Awards, Attorneys' Fees and Costs ..... 12

IV. LEGAL AUTHORITY ..... 13

V. LEGAL DISCUSSION ..... 15

A. The Court Should Certify the Proposed Class for Settlement Purposes. ..... 15

1. The Settlement Class is so numerous that joinder is impracticable. ..... 16

2. Questions of law and fact are common to the Settlement Class. ..... 17

3. Plaintiffs' claims and defenses are typical of the Settlement Class. ........ 18

4. Plaintiffs and their counsel will provide fair and adequate representation for the Settlement Class. ........ 18

5. Certification is also appropriate because common issues predominate over individualized ones, and class treatment is superior. ........ 19

B. The Settlement Terms are Fair, Adequate, and Reasonable. ........ 21

1. Class Representatives and Counsel have Adequately Represented the Class. (Fed. R. Civ. P. 23(e)(2)(A)). ........ 23

2. The Settlement is the product of good-faith arm's-length negotiations, and is absent of any collusion. (Fed. R. Civ. P. 23(e)(2)(B)). ........ 24

3. The Settlement Agreement provides substantial relief to the Settlement Class, in light of the uncertainty of prevailing on the merits, the effectiveness of the proposed distribution of relief, and the attorneys' fees sought. (Fed. R. Civ. P. 23(e)(2)(C)). ........ 25

4. The proposed Settlement treats Settlement Class Members equitably. (Fed. R. Civ. P. 23(e)(2)(D)). ........ 27

5. The "Reed" Factors considered by Fifth Circuit Courts also weigh in favor of preliminary approval. ........ 28

C. The Proposed Settlement Administrator will Provide Adequate Notice. ........ 30

VI. CONCLUSION ........ 31

# TABLE OF AUTHORITIES

**CASES:** **PAGE(S):**

*Al's Pals Pet Care v. Woodforest Nat'l Bank, NA*,
No. H-17-3852, 2019 WL 387409 (S.D. Tex. Jan. 30, 2019). .......... 22

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997). .......... 16

*Ayers v. Thompson*, 358 F.3d 356 (5th Cir. 2004). .......... 29

*Baksh v. IvyRehab Network, Inc.*, No. 7:20-CV-01845 (S.D.N.Y. Jan. 27, 2021). .......... 25

*Billittri v. Secs. Am., Inc.*, Nos. 3:09-cv-01568-F,
3:10-cv-01833-F, 2011 WL 3586217 (N.D. Tex. Aug. 4, 2011). .......... 31

*Boykin v. Georgia-Pac. Corp.*, 706 F.2d 1384 (5th Cir. 1983). .......... 16

*Chacon v. Nebraska Med.*, No. 8:21-cv-00070 (D. Neb. Sept. 15, 2021). .......... 26

*Chatelain v. C, L & W PLLC, d/b/a Affordacare Urgent Care Clinics*,
No. 50742-A (Tex. 42d Dist. Ct. Taylor Cnty. Nov. 5, 2020). .......... 26

*Cotton v. Hinton*, 559 F.2d 1326 (5th Cir. 1977). .......... 14, 29

*Dehoyos v. Allstate Corp.*, 240 F.R.D. 269 (W.D. Tex. Feb. 21, 2007). .......... 14

*Erica P. John Fund, Inc. v. Halliburton Co.*,
No. 02-CV-1152-M, 2018 WL 1942227 (N.D. Tex. Apr. 25, 2018). .......... 14

*Feder v. Elec. Data. Sys. Corp.*, 429 F.3d 125 (5th Cir. 2005). .......... 19, 23

*Garza v. Sporting Goods Props., Inc.*,
No. CIV. A. SA-93-CA-108, 1996 WL 56247 (W.D. Tex. Feb. 6, 1996). .......... 14

*Hammond v. The Bank of N.Y. Mellon Corp.*,
No. 08 Civ. 6060(RMB)(RLE), 2010 WL 2643307 (S.D.N.Y. June 25, 2010). .......... 27, 29

*Hapka v. CareCentrix, Inc.*,
No. 2:16-cv-02372-KGG, 2018 WL 1871449 (D. Kan. Feb. 15, 2018). .......... 20

*Hays v. Eaton Grp. Att'ys, LLC*,
No. 17-88-JWD-RLB, 2019 WL 427331 (M.D. La. Feb. 4, 2019). .......... 22

*In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299 (N.D. Cal. 2018). .......... 20

*In re Beef Indus. Antitrust Litig.*, 607 F.2d 167 (5th Cir. 1979). .......... 13

*In re Chinese-Manufactured Drywall Prods. Liab. Litig.*,
No. 11-CV-1363, 2012 WL 92498 (E.D. La. Jan. 10, 2012). .......... 13

*In re Combustion, Inc.*, 968 F. Supp. 1136 (W.D. La. 1997). .......... 26

*In re Deepwater Horizon*, 739 F.3d 790 (5th Cir. 2014). .......... 17

*In re Equifax, Inc. Customer Data Sec. Breach Litig.*,
No. 1:17-md-2800-TWT (N.D. Ga. 2019). .......... 16

*In re Hannaford Bros. Co. Customer Data Sec. Breach Litig.*,
293 F.R.D. 21 (D. Me. 2013). .......... 27, 29

*In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*,
851 F. Supp. 2d 1040 (S.D. Tex. 2012). .......... 14, 16, 17, 20

*In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mex.*,
910 F. Supp. 2d 891 (E.D. La. 2012). .......... 22

*In re Pool Prods. Distrib. Mkt. Antitrust Litig.*, 310 F.R.D. 300 (E.D. La. 2015). .......... 13, 14

*In re Shell Oil Refinery*, 155 F.R.D. 552 (E.D. La. 1993). .......... 13, 26

*In re Target Corp. Customer Data Sec. Breach Litig.*, 309 F.R.D. 482 (D. Minn. 2015). .......... 16

*In re Target Corp. Customer Data Sec. Breach Litig.*,
No. 14-2522, 2015 WL 7253765 (D. Minn. Nov. 17, 2015). .......... 28

*In re The Home Depot, Inc., Customer Data Sec. Breach Litig.*,
No. 1:14-md-02583-TWT, 2016 WL 6902351 (N.D. Ga. Aug. 23, 2016). .......... 20

*Jenkins v. Raymark Indus., Inc.*, 782 F.2d 468 (5th Cir. 1986). .......... 20

*Jenkins v. Trustmark Nat'l Bank*, 300 F.R.D. 291 (S.D. Miss. 2014). .......... 26

*Karvaly v. eBay, Inc.*, 245 F.R.D. 71 (E.D.N.Y. 2007). .......... 13

*Kincade v. Gen. Tire & Rubber Co.*, 635 F.2d 501 (5th Cir. 1981). .......... 14

*Mowery v. Saint Francis Healthcare Sys.*,
No. 1:20-cv-00013-SPC (E.D. Mo. Dec. 22, 2020). .......... 25

*Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306 (1950). .......... 30

*Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620 (5th Cir. 1999). ....................................... 17

*Nelson v. Constant*, No. 17-14581, 2020 WL 5258454 (E.D. La. Sept. 3, 2020). ................. 15, 17

*ODonnell v. Harris Cnty.*, No. H-16-1414, 2019 WL 422040 (S.D. Tex. Sept. 5, 2019). ..... 14, 22

*Parker v. Anderson*, 667 F.2d 1204 (5th Cir. 1982). .................................................................. 14

*Reed v. Gen. Motors Corp.*, 703 F.2d 170 (5th Cir. 1983). ............................................. 22, 23, 28

*Stirman v. Exxon Corp.*, 280 F.3d 554 (5th Cir. 2002)............................................................... 18

*Stott v. Cap. Fin. Servs. Inc.*, 277 F.R.D. 316 (N.D. Tex. Nov. 8, 2005). ............................. 22, 31

*Vaughn v. Am., Honda Motor Co.*, 627 F. Supp. 2d 738 (E.D. Tex. 2007)................................. 24

*Wal-Mart Stores v. Dukes,* 564 U.S. 338 (2011). ......................................................................... 17

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96 (2d Cir. 2005). ..................................... 24

*Welsh v. Navy Fed. Credit Union*,
No. 16-CV-1062-DAE, 2018 WL 7283639 (W.D. Tex. Aug. 20, 2018)................................. 24

**STATUTES**: **PAGE(S)**:

California's Consumer Privacy Act, Cal. Civ. Code § 1798.150. ................................................. 4

California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.* ......................... 4

Maryland's Consumer Protection Act, Md. Comm. Code §§ 13-301, *et seq.* ............................... 3

Maryland's Personal Information Privacy Act, Md. Comm. Code §§ 14-3501, *et seq.* ................. 3

Pennsylvania's Unfair Trade Practices and Consumer Protection Law,
73 Pa. Cons. Stat. §§ 201-2 & 201-3, *et seq.* ................................................................... 3

**OTHER AUTHORITIES**: **PAGE(S)**:

2 *McLaughlin on Class Actions* § 6:7 (8th ed. 2011). ............................................................... 24

2 *McLaughlin on Class Actions* § 6:7 (15th ed. 2018). ............................................................. 22

2 Newberg & Conte, *Newberg on Class Actions* § 11.22 (3d ed. 1992). .................................... 13

2 Newberg & Conte, *Newberg on Class Actions* ("*Newberg*") § 11.25 (3d ed. 1992)................ 15

2 Newberg & Conte, *Newberg on Class Actions* § 11.27 (3d ed. 1992). .................................... 13

*Manual for Complex Litigation (Fourth)* § 21.632.......................................................... 15

*Manual for Complex Litigation* § 30.44 (4th ed.)................................................. 14, 30

**RULES:** **PAGE(S):**

Fed. R. Civ. P. 12(b)(6)............................................................................... 27, 29

Fed. R. Civ. P. 23.................................................................................... passim

Fed. R. Civ. P. 23(a). ............................................................................... passim

Fed. R. Civ. P. 23(b). ..................................................................... 15, 19, 21, 30

Fed. R. Civ. P. 23(c). ....................................................................................... 30

Fed. R. Civ. P. 23(e). ............................................................................... passim

Fed. R. Civ. P. 56.................................................................................... 27, 29

Plaintiffs Jay Heath, Edward Shapiro, and Daisy Becerra Lopez ("Plaintiffs") submit this Memorandum in Support of Plaintiffs' Unopposed Motion for Preliminary Approval of Class Action Settlement.

## I. INTRODUCTION

In May 2021, Defendants Zywave, Inc. and Insurance Technologies Corp. ("Defendants" or "ITC") announced a data breach that had potentially affected the personal information of individuals who were customers of insurance brokers that were, in turn, Defendants' customers (the "Data Breach"). As a result of the Data Breach, approximately 4,341,523 individuals' personal identifying information was impacted. This class action arises out of ITC's alleged failure to safeguard the personally identifiable information ("PII") that it maintained regarding Plaintiffs and Class Members. ITC denies all liability and wrongdoing.

After extensive arm's-length negotiations and with the assistance of an independent third-party mediator, the Parties have reached a settlement that is fair, adequate, and reasonable. The agreement creates an $11,000,000 Settlement Fund, and provides for three separate categories (or "Tiers") of relief: (1) statutory cash payments to eligible Class Members who reside in California; (2) reimbursement of up to $5,000 of Out-of-Pocket expenses per Class Member, including payment for up to eight (8) hours of attested lost time, compensable at the rate of $25 per hour; and (3) 12-months of Aura's Financial Shield® product, automatically provided to every Settlement Class Member.[1] Plaintiffs strongly believe the Settlement is favorable to the Settlement Class.[2]

---

[1] The Settlement Agreement ("Agr.") in its entirety is attached as Exhibit A to the Declaration of Gary M. Klinger ("Klinger Decl.), filed herewith. Capitalized terms shall have the same meaning as assigned to them in the Settlement Agreement.
[2] *Id.* at ¶¶ 4–5.

Pursuant to Rule 23(e), Plaintiffs move the Court for an Order certifying the Class for settlement purposes, preliminarily approving the proposed Settlement Agreement, and approving the content and manner of the proposed notice process. Accordingly, and relying on the following Memorandum of Points and Authorities, the Declaration of Plaintiffs' Counsel Gary M. Klinger and attached exhibits filed herewith, Plaintiffs respectfully request the Court preliminarily approve the Parties' Settlement Agreement and issue the Proposed Order attached as Exhibit A-3 to the Declaration of Gary M. Klinger in Support of Plaintiffs' Unopposed Motion for Preliminary Approval ("Klinger Decl."), filed herewith.

## II. CASE SUMMARY

### A. The Data Incident

Defendant ITC is a provider of marketing, rating, and management software and services for insurance companies and agents. ITC sells its services and products across the United States. Klinger Decl. ¶ 30.a. Defendant Zywave is an insurance technology provider focusing on cloud-based sales management, client delivery, content, and analytics solutions. Zywave acquired ITC in 2020 to expand its customer base to more than 15,000 insurance organizations globally. *Id.* ¶ 8.b. Defendant ITC is a wholly owned subsidiary of Zywave. *Id.* ¶ 30.c. In the ordinary course of doing business with Defendants, Defendants receive sensitive PII regarding consumers such as: names; addresses; phone numbers; driver's license numbers; Social Security numbers; dates of birth; email addresses; genders; and usernames and passwords. *Id.* at ¶ 30.d.

On or about May 10, 2021, Defendant ITC began notifying consumers and state Attorneys General about a data breach that occurred on February 27, 2021 (the "Data Breach"). *Id.* at ¶ 30.f. According to the Notice of Data Breach letters and letters sent to state Attorneys General, "an unauthorized third party gained access to [ITC's] AgencyMatrix application," and "acquired

certain personal information stored in that application." *Id.* ¶ 30.g. Hackers obtained information from ITC including PII of thousands of its clients' customers, potential customers, and other individuals, including, but not limited to, their names, Social Security numbers, driver's license numbers, dates of birth, and username/password information. *Id.* ¶ 30.i.

Plaintiffs and the Class Members allege that they relied on ITC to keep their PII confidential and securely maintained, to use this information for business purposes only and to make only authorized disclosures of this information. *Id.* ¶ 30.j. Through the Data Breach, hackers allegedly were able to gain access to and exfiltrate the protected PII of hundreds of thousands of Class Members. *Id.* ¶ 30.k. Plaintiffs allege the Data Incident put them, and other Class Members, at risk of imminent, immediate and continuing risk of harm from fraud and identity theft. *Id.* ¶ 34.

**B. Procedural Posture**

Following the investigation conducted by Class Counsel, Plaintiffs Jay Heath and Edward Shapiro filed their original Class Action Complaint on June 18, 2021, asserting causes of action for: (1) Negligence; (2) Negligence *Per Se*; (3) Violation of Maryland's Personal Information Privacy Act; (4) violation of Maryland's Consumer Protection Act; (5) violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law; (6) Declaratory Judgment; and (7) Unjust Enrichment. *Id.* ¶ 32. Plaintiffs sought injunctive and equitable relief, an award of compensatory, statutory, nominal and punitive damages, reasonable fees and costs allowable by law, and any such further relief that the Court deems proper. *Id.* ¶ 33.

Soon after filing, the Parties began discussing the prospect for early resolution after an exchange of information necessary to evaluate the strengths and weaknesses of Plaintiffs' claims and ITC's defenses. *Id.* ¶ 35. In furtherance of settlement negotiations, and in accordance with the Court's Order granting the Parties' Joint Stipulation to Amend, on November 19, 2021, Plaintiffs

filed their operative and First Amended Complaint, adding Plaintiff Daisy Becerra Lopez, a California Subclass, and an eighth and ninth cause of action: (8) violation of California's Consumer Privacy Act; and (9) violation of California's Unfair Competition Law. *Id.* ¶ 36.

To further facilitate settlement negotiations, the Parties agreed to mediate Plaintiffs' claims with Christopher Nolland. Mr. Nolland is a widely respected mediator with decades of experience working as a neutral, both in mediation and arbitration. *Id.* ¶ 37. In advance of mediation, ITC provided informal discovery related to the merits of Plaintiffs' claims and class certification, and ITC's defenses, and the Parties discussed their respective positions on the merits of the claims and class certification. *Id.* ¶ 38. The Parties also fully briefed their respective positions for the mediator. *Id.* This informal exchange of information, combined with Plaintiffs' individual research, and the relevant experience of Class Counsel, allowed counsel to fully evaluate the strengths and weaknesses of Plaintiffs' case, and to conduct informed settlement negotiations. *Id.* ¶ 39.

On December 9, 2021 Counsel for Plaintiffs participated in a pre-mediation conference with Mr. Nolland. *Id.* ¶ 40. On December 13, 2021 the Parties attended a full-day mediation via Zoom Video Conference with Mr. Nolland. *Id.* ¶ 41. After a full day of arm's-length negotiations, and with the assistance of Mr. Nolland, the Parties agreed to a memorandum of understanding setting forth the essential terms of the Settlement Agreement. *Id.* ¶ 42. Over the next months, the Parties diligently drafted, negotiated, and finalized the Settlement Agreement, notice forms, and agreed upon a claims administrator. *Id.* ¶ 43.

## III. SUMMARY OF SETTLEMENT

### A. Settlement Benefits

The Settlement negotiated on behalf of the Class provides for an $11,000,000 Settlement Fund to cover three separate tiers of class relief, attorneys' fees and costs, Plaintiffs' Service

Awards (subject to court approval), and the costs of settlement administration. *Id.* ¶ 51. The Settlement provides for relief for the approximate 4,341,523 Members of the Settlement Class defined as follows:

> All individuals whose PII was potentially subjected to the Data Breach, as confirmed by Defendants' business records.

Klinger Decl. ¶ 47. The Settlement Agreement provides additional relief for eligible Members of the California Subclass, defined as:

> All residents of California at the time of the Data Breach whose PII Was potentially subjected to the Data Breach, as confirmed by Defendants' business records.

*Id.* ¶ 48. The California Subclass includes up to approximately 318,091 individuals. *Id.* ¶ 49. The Settlement Class specifically excludes the Court, the officers and directors of Defendants, persons who have been separately represented by an attorney and entered into a separate settlement agreement in connection with the Data Breach, and persons who timely and validly request exclusion from the Settlement Class. *Id.* ¶ 50.

The three separate tiers of relief created by the Settlement include: (1) a "Tier One" fund providing for the payment of $100 to $300 for each California Subclass Member, subject to potential *pro rata* reduction; (2) a "Tier Two" fund providing for reimbursement of up to $5,000 of Out-of-Pocket expenses per Class Member, including payment for up to eight hours of attested lost time, compensable at the rate of $25 per hour; and (3) 12-months of Aura's Financial Shield® product, automatically provided to every Settlement Class Member. *Id.* ¶ 52. As described in detail below, the amounts designated for Tier One and Tier Two are in a way fungible: should the number and value of claims exceed the amount designated for a given Tier's fund, the residue from either fund will be transferred before the administrator resorts to any *pro rata* reduction. *Id.* ¶ 53.

*1. Tier One Relief*

First, the Settlement creates a tier ("the "Tier One Fund") of $1,590,400 ("the Tier One Maximum") to provide a statutory payment of $100 to each eligible Member of the California Subclass. *Id.* ¶ 54. If the total value of verified Tier One Claims submitted does not exceed the Tier One Maximum, then each verified Tier One claimant will have their Tier One payment of $100 increased on a *pro rata* basis up to a maximum of three hundred dollars ($300) subject to certain provisions described below. *Id.* ¶ 55.

The determination of whether the value of the amount of verified Tier One Claims does not exceed the Tier One Maximum will be made after a determination is made as to whether a Tier Two *pro rata* reduction of verified claims would be required (because the total value of such verified Tier Two claims exceeds the Tier Two Maximum), but before the transfer of funds from Tier One to Tier Two. *Id.* ¶ 56. In the event a *pro rata* reduction of the verified claims claimed by the Tier Two claimants would be necessary, but the total amount of verified Tier One Claims does not exceed the Tier One Maximum, then such excess amounts in the Tier One Fund (the "Tier One Residue") shall be transferred by the Settlement Administrator to the Tier Two Fund up to the amount needed to pay in full the total value of verified Tier Two Claims without reducing each verified Tier One claim award below $100 per claim. Any Tier One residue remaining after a $100 to each Tier One Claimant, and full payment of valid Tier Two claims, will be used to increase, *pro rata*, the amount paid to each valid Tier One claimant. *Id.* ¶ 57.

Any funds remaining in the Tier One Fund will not revert to ITC: the Settlement provides any remaining amount be paid to the Texas Bar Foundation, subject to Court approval, as a *cy pres* recipient. *Id.* ¶ 60.

2. *Tier Two Relief*

Second, the Settlement creates a second tier ("the "Tier Two Fund") of $2,878,333 ("the Tier Two Maximum") to provide reimbursement of up to $5,000 per Class Member in Out-of-Pocket losses including compensation for lost time related to the Data Breach at the rate of $25 per hour for up to 8 hours per valid claimant from the National Class. *Id.* ¶ 61. If the total value of verified Tier Two Claims submitted does not exceed the Tier Two Maximum, then any amount remaining ("Tier Two Residue") shall be transferred by the Settlement Administrator to the Tier One Fund. *Id.* ¶ 62. If there are any funds remaining in the Tier Two Fund after the Tier Two Transfer (if any), then such funds shall be used to increase each verified Tier Two Claim on a *pro rata* basis. *Id.* ¶ 63. If the total amount of verified Tier Two Claims exceeds the Tier Two Maximum plus the Tier One Transfer (if any), payments to verified Tier Two claimants will be reduced on a *pro rata* basis. *Id.*

Out-of-Pocket losses are reimbursable if they are reasonably traceable, meaning: (1) the timing of the loss occurred on or after February 27, 2021; and (2) the personal information used to commit the purported identity theft or fraud consisted of the same type of personal information that was provided to Defendants prior to the Data Breach. *Id*. ¶ 65. A Settlement Class Member's claim for Out-of-Pocket Losses may also include a claim for up to 8 hours of time spent remedying identity theft or fraud, including misuse of personal information, credit monitoring or freezing credit reports, and/or other issues related to the Data Breach at twenty-five dollars ($25.00) per hour. Independent documentation is not required: a Class Member can claim compensation for lost time by providing a simple attestation as to the amount of time spent ("Attested Time"). *Id.* ¶ 66.

Any funds remaining in the Tier Two Fund will not revert to ITC: the Settlement provides any remaining amount be paid to the Texas Bar Foundation as a *cy pres* recipient. *Id*. ¶ 67.

*3. Tier Three Relief*

Third, the Settlement provides for one-year of Aura Financial Shield® services to be automatically provided to Settlement Class Members. *Id*. ¶ 68.

Aura Financial Shield® focuses on protecting financial assets, freezing identity at ten (10) different Bureaus including the three main credit bureaus, home and property title monitoring, income tax protection and other services. This service is integrated with Early Warning Services ("EWS") to provide real-time monitoring of financial accounts. Financial Shield® also carries a $1 million policy protecting the subscriber. *Id*. ¶ 69. Aura Financial Shield® has a starting price of $12 per month per individual:[3] this relief is thus valued at $144 per Settlement Class Member. *Id*. ¶ 70.

All Settlement Class Members are eligible to access 12-months of Aura Financial Shield®, without the need to file a claim. *Id*. ¶ 71. The Settlement Administrator shall send an activation code to each Settlement Class Member within thirty (30) days of the Effective Date which can be used to activate the Services via an enrollment website maintained by Aura. *Id.* ¶ 72. Such enrollment codes shall be sent via e-mail, unless the claimant did not provide an e-mail address, in which case such codes shall be sent via U.S. mail. *Id.* Aura shall provide Financial Shield to all valid claimants who timely activate those services for a period of 12-months from the date of activation. *Id.*

**B. The Notice and Claims Process**

The Parties have agreed to use Angeion as the Notice Provider and Claims Administrator in this case. *Id.* ¶ 74. The cost of notice and claims administration is capped at $1,500,000. *Id.* ¶ 75.

[3] *See* https://www.aura.com/pricing (last accessed Feb. 24, 2022).

*1. Notice*

The current and agreed upon Notice Plan calls for direct and individual Notice to be provided to Settlement Class Members via United States Postal Service first class mail. *Id.* ¶ 77. The Settlement Administrator will be responsible for obtaining the name and mailing address of Settlement Class Members from Defendants and performing a reverse lookup for email addresses to send notice via email when summary post card notice is returned as undeliverable. *Id*. ¶ 78. The Settlement Administrator will also establish a dedicated settlement website and will maintain and update the website throughout the claim period, with the forms of Short Notice, Long Notice, and Claim Form approved by the Court, as well as the Settlement Agreement, contact information for Class Counsel, ITC's Counsel and the Administrator. *Id*. ¶ 80. The Settlement Administrator will also make a toll-free telephone line for Settlement Class Members to call with Settlement-related inquiries, answer the questions of Settlement Class Members who call with or otherwise communicate such inquiries, and establish and maintain a post office box for mailed written notifications of exclusion or objections from the Settlement Class. *Id*. ¶ 82.

*2. Claims*

The timing of the claims process is structured to ensure that all Class Members have adequate time to review the terms of the Settlement Agreement, make a claim, or decide whether they would like to opt-out or object. *Id*. ¶ 83. Class Members will have seventy-five (75) days from the Notice Deadline to submit their Claim Form to the Settlement Administrator, either electronically or by mail. *Id.* ¶ 84. The Claim Form, attached to the Settlement Agreement as Exhibit 1, is written in plain language to facilitate Settlement Class Members' ease in completing it. *See* Agr. Ex. 1.

To submit a Tier One Claim, California Subclass Members must provide to the Settlement Administrator the information required to evaluate the claim, including: the California Subclass Member's full name, email address, mailing address, and phone number, which must be validated against the mailing address in Defendants' business records at the time of the Data Breach. *Id.* ¶ 58. Only the subset of California Subclass Members whose Social Security number and/or driver's license information were accessed or potentially accessed in the Data Breach, asconfirmed by Defendants' business records, will be eligible to submit a Tier One Claim. *Id.* ¶ 59.

To submit a Tier Two claim, Settlement Class Members must provide to the Settlement Administrator the information required to evaluate the claim, including: the Settlement Class Member's name and mailing address, which must be validated against the mailing address in Defendants' business records at the time of the Data Breach; (2) Reasonable Documentation supporting their claim; and (3) a brief description of the documentation describing the nature of the loss, if the nature of the loss is not apparent from the documentation alone. *Id.* ¶ 64. Documentation supporting Out-of-Pocket Losses can include receipts or other documentation not "self-prepared" by the Class Member that documents the costs incurred. *Id.* To claim up to $200 in compensation for lost time (8 hours compensable at $25 per hour), Settlement Class Members need only attest to the time spent dealing with the effects of the data breach. *Id.* ¶ 66.

Under Tier Three, enrollment codes for Aura Financial Shield® will automatically be sent to Settlement Class Members via e-mail, unless the claimant did not provide an e-mail address, in which case such codes shall be sent via U.S. mail. *Id.* ¶ 72.

The Claims Administrator is given the authority to assess the validity of claims, and to ask for additional documentation. *Id.* ¶ 85. To the extent the Settlement Administrator determines a Claim Form, along with supporting materials, is deficient in whole or part, within a reasonable

time of making such a determination, the SettlementAdministrator shall notify the Settlement Class Member of the deficiencies and give the Settlement Class Member twenty-one (21) days to cure the deficiencies. Such notifications shall be sent within twenty-one (21) days after the Claims Deadline and be sent via e-mail, unless the claimant did not provide an e-mail address, in which case such notifications shall be sent via U.S. mail if the claimant provided an address. If the Settlement Class Member attempts to cure the deficiencies but, at the sole discretion and authority of the Settlement Administrator, fails to do so, the Settlement Administrator shall notify the Settlement Class Member of that determination within ten (10) days of the determination. The Settlement Administrator may consult with Class Counsel in making such determinations. *Id.* ¶ 86.

*3. Requests for Exclusion and Objections*

Any Settlement Class Member who wishes to exclude themselves from or object to the Settlement shall have until fifty (50) days after the Notice Deadline to do so. *Id.* ¶¶ 87, 90.

The Request for Exclusion must include the individual's name and address; a statement that he or she wants to be excluded from the Action; and the individual's signature. Only one individual may be excluded from the Settlement Class per each written notification or exclusion form. No group opt-outs from the Settlement Class shall be permitted. *Id.* ¶ 88. Any Settlement Class Member who does not timely seek exclusion will be bound by the terms of the Settlement. *Id.* ¶ 89.

Objections to the Settlement or to the Motion for Fees, Costs, and Expenses and Service Awards must be timely filed electronically with the Court or mailed to the Clerk of the Court and, additionally, served concurrently on Class Counsel and Counsel for ITC. *Id.* ¶ 91. The written objection must include (a) the name of the filed action; (b) the objector's full name, address,

telephone number; email address; (c) an explanation of the basis upon which the objector claims to be a Settlement Class Member; (d) all grounds for the objection, accompanied by any legal support for the objection; (e) the identity of all counsel who represent the objector, including any former or current counsel who may be entitled to compensation for any reason related to the objection to the Settlement, the fee application, or the application for Service Awards; (f) any and all agreements that relate to the objection or the process of objecting, whether written or verbal, between objector or objector's counsel and any other person or entity; (g) a list of any persons who will be called to testify at the Final Approval Hearing in support of the objection; (h) a statement confirming whether the objector intends to appear personally or through counsel and/or testify at the Final Approval Hearing; and (i) the objector's signature on the written objection (an attorney's signature is not sufficient).

### C. Plaintiffs' Service Awards, Attorneys' Fees and Costs

The Settling Parties did not discuss the payment of attorneys' fees, costs, expenses and/or Service Award To Representative Plaintiffs, until after the substantive terms of the Settlement had been agreed upon, other than that ITC would pay reasonable attorneys' fees, costs, expenses, and a Service Award to Representative Plaintiffs as may be agreed to by ITC and Proposed Settlement Class Counsel and/or as ordered by the Court, or in the event of no agreement, then as ordered by the Court. *Id.* ¶ 93.

The Settlement Agreement calls for a reasonable Service Award to Plaintiffs in the amount of $2,000 per Plaintiff, subject to Court approval. *Id.* ¶ 95. The Service Award is meant to compensate Plaintiffs for their efforts which include maintaining contact with counsel, reviewing and approving pleadings, assisting in the investigation of the case, remaining available for

consultation throughout mediation, reviewing the Settlement documents, and for answering counsel's many questions. *Id*. ¶ 96.

As part of the Settlement Agreement, ITC has agreed to pay attorneys' fees in the amount of up to $3,666,666.67—one-third of the Settlement Fund—plus litigation costs and expenses not to exceed $30,000 as approved by the Court. *Id.* ¶ 94.

Class Counsel will submit a separate motion seeking attorneys' fees, costs, and Plaintiffs' Service Awards prior to prior to Settlement Class Members' deadline to exclude themselves from or object to the Settlement Agreement. *Id.* ¶ 97.

## IV. LEGAL AUTHORITY

Rule 23(e) requires court approval of any class settlement, following notice to the class. The preliminary approval stage provides a forum for the initial evaluation of a settlement, and where no class has been previously certified, a determination as to whether a proposed settlement class should be certified. 2 Newberg & Conte, *Newberg on Class Actions* §§ 11.22, 11.27 (3d ed. 1992); *In re Beef Indus. Antitrust Litig.*, 607 F.2d 167, 175 (5th Cir. 1979). "First, the court must preliminarily approve the settlement. Then, the members of the class must be given notice of the proposed settlement, and finally, after a hearing, the court must determine whether the proposed settlement is fair, reasonable, and adequate." *In re Shell Oil Refinery*, 155 F.R.D. 552, 555 (E.D. La. 1993). At this preliminary approval stage, the settling parties bear the burden of demonstrating that the settlement is fair, reasonable, and adequate. *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, No. 11-CV-1363, 2012 WL 92498, at *7 (E.D. La. Jan. 10, 2012). The standards at preliminary approval are not as stringent as those applied to a motion for final approval. *In re Pool Prods. Distrib. Mkt. Antitrust Litig.*, 310 F.R.D. 300, 314 (E.D. La. 2015) (citing *Karvaly v. eBay, Inc.*, 245 F.R.D. 71, 86 (E.D.N.Y. 2007)). "If the proposed settlement discloses no reason to doubt

its fairness, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, does not grant excessive compensation to attorneys, and appears to fall within the range of possible approval, the court should grant preliminary approval." *In re Pool Prods. Distrib. Market Antitrust Litig.*, 310 F.R.D. at 314–15.

Plaintiffs here seek preliminary approval of the proposed Settlement—an initial evaluation of the fairness of the proposed Settlement. *See Manual for Complex Litigation* § 30.44 (4th ed.). Judicial and public policy favors the resolution of disputes through settlement. *ODonnell v. Harris Cnty.*, No. H-16-1414, 2019 WL 422040, at *8 (S.D. Tex. Sept. 5, 2019); *Parker v. Anderson*, 667 F.2d 1204, 1209 (5th Cir. 1982); *see also Kincade v. Gen. Tire & Rubber Co.*, 635 F.2d 501, 507 (5th Cir. 1981) ("Particularly in class action suits, there is an overriding public interest in favor of settlement." (quoting *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977)). There is a strong presumption in favor of finding settlement agreements fair—particularly when they have been reached by experienced counsel, with the assistance of a third-party neutral, after a meaningful exchange of information. *ODonnell v. Harris Cnty.*, 2019 WL 4224040, at *8 (citing *Erica P. John Fund, Inc. v. Halliburton Co.*, No. 02-CV-1152-M, 2018 WL 1942227, at *4 (N.D. Tex. Apr. 25, 2018) (quoting *In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*, 851 F. Supp. 2d 1040, 1063 (S.D. Tex. 2012))). Settlement agreements are not required to "achieve some hypothetical standard constructed by imagining every benefit that might someday be obtained in contested litigation"—rather, compromise is the essence of settlement, and a court may rely on the judgment of experienced counsel for the parties. *Dehoyos v. Allstate Corp.*, 240 F.R.D. 269, 286 (W.D. Tex. Feb. 21, 2007) (quoting *Garza v. Sporting Goods Props., Inc.*, No. CIV. A. SA-93-CA-108, 1996 WL 56247 (W.D. Tex. Feb. 6, 1996)). In granting preliminary approval, the Court

determines it will "likely" be able to grant final approval of the Settlement under Rule 23(e)(2) and certify the Class for purposes of Settlement.

Because the proposed Settlement Agreement falls within the range of possible approval, this Court should grant Plaintiffs' Motion and allow notice to be provided to the Class. *See* 2 Newberg & Conte, *Newberg on Class Actions* ("*Newberg*") § 11.25 (3d ed. 1992).

## V. LEGAL DISCUSSION

### A. The Court Should Certify the Proposed Class for Settlement Purposes.

Plaintiff here seeks certification of a Nationwide Class consisting of "[a]ll individuals whose PII was potentially subjected to the Data Breach, as confirmed by Defendants' business records," and a California Subclass defined as "[a]ll residents of California at the time of the Data Breach whose PII was potentially subjected to the Data Breach, as confirmed by Defendants' business records" with specific and limited exclusions. *See* Klinger Decl. ¶¶ 47–50. The *Manual for Complex Litigation (Fourth)* advises that in cases presented for both preliminary approval and class certification, the "judge should make a preliminary determination that the proposed class satisfies the criteria". *Manual for Complex Litigation (Fourth)* § 21.632.

Under Rule 23, a class action may be maintained where the movants demonstrate (1) the class is so numerous that joinder is impracticable; (2) the class has common questions of law or fact; (3) the representatives' claims are typical of the class claims; and (4) the representatives will fairly and adequately protect class interests. *Nelson v. Constant*, No. 17-14581, 2020 WL 5258454, at *4 (E.D. La. Sept. 3, 2020) (citing Rule 23(a)). Additionally, under Rule 23(b)(3), a class may be maintained where "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

Because a court evaluating certification of a class action that settled is considering certification only in the context of settlement, the court's evaluation is somewhat different than in a case that has not yet settled. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997). In some ways, the court's review of certification of a settlement-only class is lessened: as no trial is anticipated in a settlement-only class case, the case management issues inherent in the ascertainable class determination need not be confronted. *See id.* Other certification issues however, such as "those designed to protect absentees by blocking unwarranted or overbroad class definitions" require heightened scrutiny in the settlement-only class context "for a court asked to certify a settlement class will lack the opportunity, present when a case is litigated, to adjust the class, informed by the proceedings as they unfold." *Id*.

Despite the necessarily rigorous analysis of certain prongs at the preliminary certification stage, class actions are regularly certified for settlement. In fact, similar data breach cases have been certified—on a *national* basis—including the record-breaking settlement in *In re Equifax. See In re Equifax, Inc. Customer Data Sec. Breach Litig.*, No. 1:17-md-2800-TWT (N.D. Ga. 2019). *See, also, e.g.*, *In re Target Corp. Customer Data Sec. Breach Litig.*, 309 F.R.D. 482 (D. Minn. 2015); *In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig*., 851 F. Supp. 2d 1040 (S.D. Tex. 2012). This case is no different.

*1. The Settlement Class is so numerous that joinder is impracticable.*

Numerosity requires "the class [be] so numerous that joinder of all members is impractical." Fed. R. Civ. P. 23(a)(1). The Fifth Circuit has noted that a class of 20 individuals is "much too small to meet the numerosity requirement." *Boykin v. Georgia-Pac. Corp.*, 706 F.2d 1384, 1386 (5th Cir. 1983). A class of 100 to 150 members, however, "is within the range that

generally satisfied the numerosity requirement." *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 624 (5th Cir. 1999).

Here, both the Nationwide Class and the California Subclass clearly surpass the threshold required to establish numerosity. As the proposed Settlement Class includes 4,341,523 individuals who had PII compromised by the Data Breach, up to approximately 318,091 of whom are a part of the California Subclass, judicial economy would be well-served by certification. Accordingly, the Settlement Class is sufficiently numerous to justify certification.

2. *Questions of law and fact are common to the Settlement Class.*

Commonality requires Plaintiffs to demonstrate "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The threshold for meeting this prong is not high. Commonality does not require that every question be common to every member of the class, but rather that the questions linking class members are substantially related to the resolution of the litigation and capable of generating common answers "apt to drive the resolution of the litigation" even where the individuals are not identically situated. *In re Heartland Payment Sys.*, 851 F. Supp. 2d at 1052 (citing *Wal-Mart Stores v. Dukes,* 564 U.S. 338, 347 (2011)). Commonality can be satisfied by an "instance of the defendant's injurious conduct, even when the resulting injurious effects—the damages—are diverse." *Nelson v. Constant*, 2020 WL 5258454, at *5 (quoting *In re Deepwater Horizon*, 739 F.3d 790, 810–11 (5th Cir. 2014)).

Here, the commonality requirement is met because Plaintiffs can demonstrate numerous common issues exist. For example, whether ITC failed to adequately safeguard the records of Plaintiffs and other Settlement Class Members is a question common across the entire Class. ITC's data security safeguards were common across the Class, and those applied to the data of one Settlement Class Member did not differ from those safeguards applied to another.

Other specific common issues include (but are not limited to):

- Whether ITC failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of information compromised in the Data Incident;
- Whether ITC's data security systems prior to and during the Data Incident complied with applicable data security laws and regulations; and
- Whether ITC's conduct rose to the level of negligence.

These common questions, and others alleged by Plaintiffs in their First Amended Complaint, are central to the causes of action brought here, will generate common answers, and can be addressed on a class-wide basis. Thus, Plaintiffs have met the commonality requirement of Rule 23.

3. *Plaintiffs' claims and defenses are typical of the Settlement Class.*

Under Rule 23(a)(3), the typicality requirement is satisfied where "the claims or defenses of the class representatives have the same essential characteristics as those of the class as a whole." "If the claims arise from a similar course of conduct and share the same legal theory, factual differences will not defeat typicality." *See Stirman v. Exxon Corp.*, 280 F.3d 554, 562 (5th Cir. 2002).

Here, Plaintiffs' and Settlement Class Members' claims all stem from the same event—the hacker's attack on ITC's computers and servers—and the cybersecurity protocols that ITC had (or did not have) in place to protect Plaintiffs' and Settlement Class Members' data. Thus, Plaintiffs' claims are typical of the Settlement Class Members' and the typicality requirement is satisfied.

4. *Plaintiffs and their counsel will provide fair and adequate representation for the Settlement Class.*

Representative plaintiffs must be able to provide fair and adequate representation for the class. To satisfy the adequacy of representation requirement, plaintiffs must establish that: (1) the

there is no antagonism or conflict of interest between the class representatives and other members of the class; and (2) counsel and the class representatives are competent, willing, and able to protect the interests of absent class members. *Feder v. Elec. Data. Sys. Corp.*, 429 F.3d 125, 130 (5th Cir. 2005).

Here, Plaintiffs' interests are aligned with those of the Settlement Class in that they seek relief for injuries arising out of the same Data Breach. Plaintiffs' and Settlement Class Members' data was all allegedly compromised by Defendants in the same manner. Under the terms of the Settlement Agreement, Plaintiffs and Settlement Class Members will all be eligible for the same reimbursement of Out-of-Pocket expenses and lost time and Aura's Financial Shield®. Moreover, Plaintiff Becerra Lopez (a California resident) and the California Subclass will all be eligible for the same statutory payment, reduced or increased *pro rata* based on the claims rate and availability of funds.

Further, counsel for Plaintiffs have decades of combined experience as vigorous class action litigators and are well suited to advocate on behalf of the Class. *See* Klinger Decl. ¶¶ 4–27; MLK Firm Resume at Klinger Decl., Ex. B1; Decl. of M. Andersen Berry at Klinger Decl., Ex. B2; Decl. of John Yanchunis at Klinger Decl., Ex. B3; Decl. of Joe Kendall at Klinger Decl. Ex. B4. Moreover, they have put their collective experience to use in negotiating an early-stage Settlement that guarantees immediate relief to Class Members. Thus, the requirements of Rule 23(a) are satisfied.

*5. Certification is also appropriate because common issues predominate over individualized ones, and class treatment is superior.*

Rule 23(b)(3) provides that class certification is proper when "questions of law or fact common to class members predominate over any questions affecting only individual members,

and that a class action is superior to other available methods for failure and efficiently adjudicating the controversy." This inquiry is two-fold.

First, "[i]n order to 'predominate,' common issues must constitute a significant part of the individual cases." *Jenkins v. Raymark Indus., Inc.*, 782 F.2d 468, 472 (5th Cir. 1986). In this case, key predominating questions are whether ITC had a duty to exercise reasonable care in safeguarding, securing, and protecting the personal information of Plaintiffs and the Settlement Class, and whether ITC breached that duty. The common questions that arise from ITC's conduct predominate over any individualized issues. Other courts have recognized that the types of common issues arising from data breaches predominate over any individualized issues. *See, e.g.*, *In re Heartland*, 851 F. Supp. 2d at 1059 (finding predominance satisfied in data breach case despite variations in state laws at issue, concluding such variations went only to trial management, which was inapplicable for settlement class); *In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299, 312–15 (N.D. Cal. 2018) (finding predominance was satisfied because "Plaintiffs' case for liability depend[ed], first and foremost, on whether [the defendant] used reasonable data security to protect Plaintiffs' personal information," such that "the claims rise or fall on whether [the defendant] properly secured the stolen personal information," and that these issues predominated over potential individual issues); *see also Hapka v. CareCentrix, Inc.*, No. 2:16-cv-02372-KGG, 2018 WL 1871449, at *2 (D. Kan. Feb. 15, 2018) (finding predominance was satisfied in a data breach case, stating "[t]he many common questions of fact and law that arise from the E-mail Security Incident and [Defendant's] alleged conduct predominate over any individualized issues"); *In re The Home Depot, Inc., Customer Data Sec. Breach Litig.*, No. 1:14-md-02583-TWT, 2016 WL 6902351, at *2 (N.D. Ga. Aug. 23, 2016) (finding common predominating questions included whether Home Depot failed to reasonably protect class members' personal and financial

information, whether it had a legal duty to do so, and whether it failed to timely notify class members of the data breach).

Second, the resolution of millions of claims in one action is far superior to litigation via individual lawsuits. Class certification—and class resolution—guarantee an increase in judicial efficiency and conservation of resources over the alternative of individually litigating tens of thousands of individual data breach cases arising out of the *same* Data Breach. The common questions of fact and law that arise from Defendants' conduct predominate over any individualized issues, a class action is the superior vehicle by which to resolve these issues, and the requirements of Rule 23(b)(3) are met. Accordingly, the Class should be certified for settlement purposes.

**B. The Settlement Terms are Fair, Adequate, and Reasonable.**

On preliminary approval, and prior to approving notice be sent to the proposed Class, the Court must determine that it will "likely" be able to grant final approval of the Settlement under Rule 23(e)(2). Under Rule 23(e)(2), in order to give a settlement final approval, the court must consider whether the proposed settlement is "fair, reasonable, and adequate after considering whether: (A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate . . . ; and (D) the proposal treats class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(A)–(D). In determining whether the relief provided is adequate, Courts must consider: "(i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3)." *Id.* 23(e)(2)(C)(i)–(iv).

Before the 2018 revisions to Rule 23(e), the Fifth Circuit had developed its own factors for determining whether a settlement was fair, adequate, and reasonable including: (1) evidence that the settlement was obtained by fraud or collusion; (2) the complexity, expense, and likely duration of the litigation; (3) the stage of the litigation and available discovery; (4) the probability of plaintiffs' prevailing on the merits; (5) the range of possible recovery and certainty of damages; and (6) the opinions of class counsel, class representatives, and absent class members. *Stott v. Cap. Fin. Servs. Inc.*, 277 F.R.D. 316, 343 (N.D. Tex. Nov. 8, 2005) (citing *Reed v. Gen. Motors Corp.*, 703 F.2d 170, 172 (5th Cir. 1983)).

Because the Rule 23 and *Reed* factors overlap, Fifth Circuit Courts often combine them in analyzing class settlements. *ODonnell v. Harris Cnty.,* 2019 WL 4224040, at *8 (citing *Hays v. Eaton Grp. Att'ys, LLC*, No. 17-88-JWD-RLB, 2019 WL 427331, at *9 (M.D. La. Feb. 4, 2019)); *Al's Pals Pet Care v. Woodforest Nat'l Bank, NA*, No. H-17-3852, 2019 WL 387409, at *3 (S.D. Tex. Jan. 30, 2019); *see also* Fed. R. Civ. P. 23(e)(2) Committee Notes to 2018 amendments ("The goal of this amendment [to Rule 23(e)(2)] is not to displace any [circuit case-law] factor, but rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal.").

Because the public interest strongly favors the voluntary settlement of class actions, there is a strong presumption in favor of finding the settlement fair, reasonable, and adequate. *Hays v. Eaton Grp. Att'ys, LLC*, 2019 WL 427331, at *9; *In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mex.*, 910 F. Supp. 2d 891, 930–31 (E.D. La. 2012). A proposed settlement "will be preliminarily approved unless there are obvious defects in the notice or other technical flaws, or the settlement is outside the range of reasonableness or appears to be the product of collusion, rather than arms-length negotiation." 2 *McLaughlin on Class Actions* § 6:7 (15th ed. 2018). Here,

because the Settlement Agreement is fair, reasonable, and adequate under both the Rule 23 criteria and the Fifth Circuit's *Reed* factors, this Court should grant preliminary approval and allow notice to issue to the Class.

*1. Class Representatives and Counsel have Adequately Represented the Class. (Fed. R. Civ. P. 23(e)(2)(A)).*

As discussed at Section VI(A)(4) *supra*, to satisfy the adequacy of representation requirement, plaintiffs must establish that: (1) the there is no antagonism or conflict of interest between the class representatives and other members of the class; and (2) counsel and the class representatives are competent, willing, and able to protect the interests of absent class members. *Feder v. Elec. Data. Sys. Corp.*, 429 F.3d at 130. Here, the Class Representatives, like all Class Members, have been the subjects of the same Data Breach, and thus have common interests with the Class. Moreover, they have ably represented the Class, maintaining contact with counsel, reviewing and approving pleadings, assisting in the investigation of the case, remaining available for consultation throughout mediation, reviewing the Settlement documents, and for answering counsel's many questions. Klinger Decl. ¶ 95.

Proposed Class Counsel too have vigorously pursued the interests of the Class in securing a Settlement that brings immediate benefits to Class and Subclass Members while avoiding the risks of continued litigation. In doing so, they leaned on their extensive experience in data breach litigation, their detailed investigation of this particular matter, and informal discovery exchanged during the course of their negotiations. Klinger Decl.¶ 4–27, 28–31, 37–42. As such, this factor warrants preliminary approval.

2. *The Settlement is the product of good-faith arm's-length negotiations, and is absent of any collusion. (Fed. R. Civ. P. 23(e)(2)(B)).*

"The Court may . . . presume that no fraud or collusion occurred between opposing counsel in the absence of any evidence to the contrary." *Welsh v. Navy Fed. Credit Union*, No. 16-CV-1062-DAE, 2018 WL 7283639, at *12 (W.D. Tex. Aug. 20, 2018). "A settlement reached after a supervised mediation receives a presumption of reasonableness and the absence of collusion." 2 *McLaughlin on Class Actions* § 6:7 (8th ed. 2011); *see also Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116 (2d Cir. 2005) (internal quotation omitted). Here, there is no evidence of fraud or collusion that could possibly be presented. After fully briefing the issues, and convening for a pre-mediation conference, the Parties attended a day-long mediation via Zoom Video Conference where, with the assistance of respected neutral Christopher Nolland, the Parties eventually agreed to a memorandum of understanding. *Id.* ¶¶ 38–42. Following the mediation, the Parties spent months negotiating, drafting, and finalizing the finer points of the agreement presently before the Court. *Id.* ¶ 43. Moreover, the proposed Settlement also does not favor any Class Member or group of Class Members, which also weighs against any evidence of fraud or collusion and in favor of approval. *See Vaughn v. Am., Honda Motor Co.*, 627 F. Supp. 2d 738, 748 (E.D. Tex. 2007). Accordingly, and in absence of any facts suggesting negotiations were at all improper, the presumption of reasonableness should apply here, and Plaintiffs should be found to have met this requirement.

3. *The Settlement Agreement provides substantial relief to the Settlement Class, in light of the uncertainty of prevailing on the merits, the effectiveness of the proposed distribution of relief, and the attorneys' fees sought. (Fed. R. Civ. P. 23(e)(2)(C)).*

Most importantly, the Settlement guarantees Class Members real relief for harms and protections from potential future fall-out from the Data Breach. Thus, the third and most important factor weighs heavily in favor of preliminary approval.

First, all Settlement Class Members will *automatically* receive a code to enroll in 12-months of Aura Financial Shield®, a credit and identity protection service valued at $144 per person that focuses on protecting financial assets, freezing identity at 10 different Bureaus, home and property title monitoring, and income tax protection, and carries a $1 million policy protecting each subscriber. Klinger Decl. ¶¶ 68–71. Second, all Settlement Class Members are eligible to submit a claim for up to $5,000 in reimbursements of Out-of-Pocket expenses and lost time related to the Data Breach. *Id.* ¶¶ 61–67. Lost time can be claimed for up to 8 hours at $25 per hour, with a simple attestation. *Id.* And finally, California Subclass Members are eligible for a statutory payment of up to $300, depending on the claims rate. *Id.* ¶¶ 54–60.

This Settlement terms are consistent with, and in fact exceed, agreement terms approved by Courts in other, similar data breach cases. *Mowery v. Saint Francis Healthcare Sys.*, No. 1:20-cv-00013-SPC (E.D. Mo. Dec. 22, 2020) (data breach settlement providing up to $280 in value to settlement class members in the form of: reimbursement up to $180 of out of pocket expenses and time spent dealing with the data breach; credit monitoring services valued at $100; and equitable relief in the form of data security enhancements); *Baksh v. IvyRehab Network, Inc.*, No. 7:20-CV-01845 (S.D.N.Y. Jan. 27, 2021) (providing up to $75 per class member out-of-pocket expenses incurred related to the data breach and $20 reimbursement for lost time, with payments capped at $75,000 in aggregate; credit monitoring for claimants; and equitable relief in the form of data

security enhancements); *Chacon v. Nebraska Med.*, No. 8:21-cv-00070 (D. Neb. Sept. 15, 2021) (data breach settlement providing up to $300 in ordinary expense reimbursements including to 6 hours of lost time at $20 per hour; up to $3,000 in extraordinary expense reimbursements; one-year of automatic credit monitoring; data security enhancements); *Chatelain v. C, L & W PLLC, d/b/a Affordacare Urgent Care Clinics*, No. 50742-A (Tex. 42d Dist. Ct. Taylor Cnty. Nov. 5, 2020) (data breach settlement providing 12-months of credit monitoring services and no expense reimbursements). Upon final approval of the Settlement, the relief will be distributed by the Settlement Administrator to all Settlement Class Members.

Moreover, as will be discussed at length in Plaintiffs' Motion for Attorneys' Fees, Costs, and Service Awards, the attorneys' fees agreed to here constitute one-third of the $11 million Settlement Fund. Attorneys' fees requests in the amount of one-third of a common fund are regularly granted by Fifth Circuit Courts. *In re Shell Oil Refinery*, 155 F.R.D. 552 (E.D. La. 1993) (awarding fees of one-third of a $170 million common fund); *In re Combustion, Inc.*, 968 F. Supp. 1136, 1142 (W.D. La. 1997) (approving a 36% fee of a $127 million common fund); *See Jenkins v. Trustmark Nat'l Bank*, 300 F.R.D. 291, 307 (S.D. Miss. 2014) (approving fees of 33.33% of a $4 million common fund) (collecting additional cases).

The value achieved through the Settlement Agreement is guaranteed, where chances of prevailing on the merits are uncertain. While Plaintiffs strongly believe in the merits of their case, they also understand that ITC asserts a number of potentially case-dispositive defenses. In fact, should litigation continue, Plaintiffs would likely have to immediately survive a motion to dismiss in order to proceed with litigation. Due at least in part to their cutting-edge nature and the rapidly evolving law, data breach cases like this one generally face substantial hurdles—even just to make it past the pleading stage. *See Hammond v. The Bank of N.Y. Mellon Corp.*, No. 08 Civ.

6060(RMB)(RLE), 2010 WL 2643307, at *1 (S.D.N.Y. June 25, 2010) (collecting data breach cases dismissed at the Rule 12(b)(6) or Rule 56 stage). Class certification is another hurdle that would have to be met—and one that been denied in other data breach cases. *See, e.g.*, *In re Hannaford Bros. Co. Customer Data Sec. Breach Litig.*, 293 F.R.D. 21 (D. Me. 2013).

Plaintiffs dispute the defenses ITC asserts—but it is obvious that their success at trial is far from certain. Through the Settlement, Plaintiffs and Class Members gain significant benefits without having to face further risk of not receiving any relief at all.

*4. The proposed Settlement treats Settlement Class Members equitably. (Fed. R. Civ. P. 23(e)(2)(D)).*

Here, the proposed Settlement does not improperly discriminate between any segments of the Settlement Class. All Settlement Class Members are eligible to make a claim for the same amount of Out-of-Pocket expense reimbursements and lost time. Moreover, all Settlement Class Members will also *automatically* receive a code for enrolling in 12 months of Aura Financial Shield® services. And, while California Subclass Members are eligible for an additional payment, such a payment is only available because they are eligible for additional statutory benefits that cover only residents of California. Importantly, direct Notice will be sent to Settlement Class Members, and all Settlement Class Members will also have the opportunity to object to or exclude themselves from the Settlement. And, while Plaintiffs will each be seeking a $2,000 award for their services on behalf of the Class, this award is *less than* one-half of the amount that any given Class Member can claim in reimbursements, and is justified by the benefits brought to the Class by the work of the Plaintiffs.

Accordingly, this factor also weighs in favor of preliminary approval.

5. *The "Reed" Factors considered by Fifth Circuit Courts also weigh in favor of preliminary approval.*

The factors considered by Eight Circuit Courts prior to the amendment of Rule 23, and still considered by those Courts today, also weigh in favor of final approval.

*First*, as discussed at length above, there is no evidence of fraud or collusion between the Parties. In fact, the Settlement was only reached after months of arm's-length negotiations and with the assistance of respected neutral Christopher Nolland. The Settlement provides for significant relief in light of the risks of proceeding with further litigation. As discussed extensively in Section V(b)(iii), *supra*, while Plaintiffs are confident in the merits of their claims, they face significant risk in further litigation due in part to the constantly evolving nature of data breach litigation. Thus, this factor weighs in favor of preliminary approval.

*Second*, continued litigation is likely to be complex, lengthy, and expensive. Although Plaintiffs are confident in the merits of their claims, the risks discussed above cannot be disregarded. Aside from the potential that either side will lose at trial, the Plaintiffs anticipate incurring substantial additional costs in pursuing this litigation further. Should litigation continue, Plaintiffs would likely need to defeat a motion to dismiss, counter a later motion for summary judgement, and both gain and maintain certification of the Class. The level of additional costs would significantly increase as Plaintiffs began their preparations for the certification argument and if successful, a near inevitable interlocutory appeal attempt. As at least one court has found in this Circuit, because the "legal issues involved in [in data breach litigation] are cutting-edge and unsettled . . . many resources would necessarily be spent litigating substantive law as well as other issues." *In re Target Corp. Customer Data Sec. Breach Litig.*, No. 14-2522, 2015 WL 7253765, at *2 (D. Minn. Nov. 17, 2015).

*Third*, Settlement was reached only after extensive investigation by the Parties and an informal exchange of information such that Class Counsel could fully understand the strengths and weaknesses of Plaintiffs' claims and ITC's defenses. Where Parties possess ample information with which to evaluate the merits of competing positions, a lack of formal discovery will not prevent preliminary approval of a settlement. *Ayers v. Thompson*, 358 F.3d 356, 369 (5th Cir. 2004); *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 2007).

*Fourth*, continued litigation presents substantial risks. As discussed above, data breach cases like this one generally face substantial hurdles—even just to make it past the pleading stage. *See Hammond v. The Bank of N.Y. Mellon Corp.*, 2010 WL 2643307, at *1 (collecting data breach cases dismissed at the Rule 12(b)(6) or Rule 56 stage). Class certification is another hurdle that would have to be met—and one that been denied in other data breach cases. *See, e.g.*, *In re Hannaford Bros. Co. Customer Data Sec. Breach Litig.*, 293 F.R.D. 21 (D. Me. 2013).

*Fifth*, the Settlement negotiated here provides for recovery that equals or surpasses that of similar Settlements approved by Courts across the country. *See* Section VI(B)(3), *supra.* As such, this factor—and the benefits to be provided by expediently providing Class Members relief—weigh in favor of preliminary approval.

*Sixth*, while this factor is most appropriately examined after the Class has been issued notice and had a chance to respond, Plaintiffs have no reason to believe there will be any antagonism to the Settlement. Plaintiffs approve of its terms. As importantly, proposed Class Counsel, with their depth of experience in litigating data breach class actions, maintain the Settlement provides significant relief to Members of the Class and Plaintiffs strongly believe that it is favorable for the Settlement Class, fair, reasonable, adequate, and worthy of preliminary approval. Klinger Decl. ¶¶ 25–26, 46.

Thus, these additional factors weigh in favor of approving a result exactly like that obtained by Plaintiffs and Class Counsel: significant cash payments for all Settlement Class Members who submit valid claims, credit monitoring services automatically provided to all Settlement Class Members, and statutory payments to the California Subclass Members who submit a valid claim. Accordingly, the Settlement should be preliminarily approved.

**C. The Proposed Settlement Administrator will Provide Adequate Notice.**

Rule 23(e)(1) requires the Court to "direct reasonable notice to all class members who would be bound by" a proposed Settlement. For classes, like this one, certified under Rule 23(b)(3), parties must provide "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). The best practicable notice is that which "is reasonably calculated, under all of the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950).

The Notice provided for by the Settlement Agreement is designed to meet all the criteria set forth by Rule 23 and the *Manual for Complex Litigation*. *See* Agr. Exs. A–C. Here, the Settlement provides for direct and individual notice, to be sent via first class mail to each Settlement Class Member. Klinger Decl. ¶ 77. Where the summary postcard notice is returned undeliverable, the Settlement Administrator will perform a reverse lookup for the Class Member email addresses to send notices via email. *Id.* ¶ 78. The mailing will be completed only after the Settlement Administrator within 35-days of receiving the Class List.

Not only has ITC agreed to provide Settlement Class Members with individualized notice via direct mail through the proposed claims administrator, but all versions of the Settlement Notice

will be available to Settlement Class Members on the Settlement Website, along with all relevant filings. *Id.* ¶ 80. The Settlement Administrator will also make post office box and toll-free telephone number available by which Settlement Class Members can seek answers to questions or request a notice or claim form be mailed to them at their address. *Id.* ¶ 82.

The notices themselves are clear and straightforward. They define the Class and Subclass; clearly describe the options available to Class Members and the deadlines for taking action; describe the essential terms of the Settlement; disclose the requested Service Award for the Class Representatives as well as the amount that proposed Settlement Class Counsel intends to seek in fees and costs; explain procedures for making claims, objections, or requesting exclusion; provide information that will enable Settlement Class Members to calculate their individual recovery; describe the date, time, and place of the Final Fairness Hearing; and prominently display the address and phone number of Class Counsel. *See* Agr. Exs. 1-2.

The direct mail Notice proposed here is the gold standard, and is consistent with Notice programs approved in this Circuit. *See Stott v. Cap. Fin. Servs.*, 277 F.R.D. at 342 (approving notice sent to all class members by first class mail); *Billittri v. Secs. Am., Inc.*, Nos. 3:09-cv-01568-F, 3:10-cv-01833-F, 2011 WL 3586217, at *9 (N.D. Tex. Aug. 4, 2011) (same). The Notice is designed to be the best practicable under the circumstances, apprises Settlement Class Members of the pendency of the action, and gives them an opportunity to object or exclude themselves from the Settlement. Accordingly, the Notice process should be approved by this Court.

## VI. CONCLUSION

Plaintiffs have negotiated a fair, adequate, and reasonable Settlement that guarantees Settlement Class Members significant relief in the form of monetary payments and identity theft protections. The Settlement Agreement is well within the range of reasonable results, and an initial

assessment of factors required to be considered on final approval favors approval. For these and the above reasons, Plaintiffs respectfully request this Court certify the Class for settlement purposes and grant their Motion for Preliminary Approval of Class Action Settlement.

Dated: February 28, 2022

Respectfully submitted,

*/s/ Gary M. Klinger*

GARY M. KLINGER**
**MASON LIETZ & KLINGER LLP**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Telephone: (202) 429-2290
Facsimile: (202) 429-2294
gklinger@masonllp.com

Joe Kendall
Texas Bar No. 11260700
**KENDALL LAW GROUP, PLLC**
3811 Turtle Creek Blvd., Ste. 1450
Dallas, TX 75219
Telephone: (214) 744-3000
Facsimile: (214) 744-3015
jkendall@kendalllawgroup.com

M. ANDERSON BERRY**
**CLAYEO C. ARNOLD,**
**A PROFESSIONAL LAW CORP.**
865 Howe Avenue
Sacramento, CA 95825
Telephone: (916) 777-7777
Facsimile: (916) 924-1829
aberry@justice4you.com

GARY E. MASON*
DAVID K. LIETZ*
**MASON LIETZ & KLINGER LLP**
5101 Wisconsin Avenue NW, Suite 305
Washington, DC 20016
Telephone: (202) 429-2290
Facsimile: (202) 429-2294
dlietz@masonllp.com
gmason@masonllp.com

JOHN A. YANCHUNIS
Texas Bar No. 22121300
RYAN MAXEY*
**MORGAN & MORGAN**
**COMPLEX LITIGATION GROUP**
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
Telephone: (813) 559-4908
Facsimile: (813) 222-4795
jyanchuins@forthepeople.com
rmaxey@forthepeople.com

*Attorneys for Plaintiffs and the Class*

**Pro hac vice forthcoming*
***Admitted pro hac vice*