**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| JAY HEATH, EDWARD SHAPIRO, and DAISY BECERRA LOPEZ, individually and on behalf of all similarly situated persons,<br><br>        Plaintiffs,<br><br>   v.<br><br>INSURANCE TECHNOLOGIES CORP. and ZYWAVE, INC.,<br><br>        Defendants. | Case No. 3:21-cv-01444-N |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR FINAL
APPROVAL OF CLASS ACTION SETTLEMENT, AWARD OF ATTORNEYS' FEES,
EXPENSES, AND SERVICE AWARDS**

**<u>TABLE OF CONTENTS</u>**

<u>**PAGE(S)**</u>

I.     INTRODUCTION ................................................................................................ 1

II.    CASE SUMMARY .............................................................................................. 1

     A.  Factual Background. ................................................................................. 1

     B.  The Litigation .......................................................................................... 3

     C.  Mediation and Settlement. ...................................................................... 3

     D.  Settlement Benefits. ................................................................................. 4

          *1. Tier One Relief* ............................................................................ 5

          *2. Tier Two Relief* ............................................................................ 6

          *3. Tier Three Relief* ......................................................................... 7

     E.  Preliminary Approval and Notice. .......................................................... 8

III.    THE NOTICE AND CLAIMS PROCESS. ......................................................... 9

     A.  Class Notice. ........................................................................................... 9

     B.  Case Specific Website and Hotline ....................................................... 10

     C.  Class Response ...................................................................................... 11

IV.    THE SETTLEMENT CLASS AND SUBCLASS ............................................ 11

V.     LEGAL STANDARD ....................................................................................... 12

VI.    THE PROPOSED SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE
PURSUANT TO RULE 23(E) AND THE FIFTH CIRCUIT REED FACTORS. ......... 14

     A.  Plaintiffs and Class Counsel Have Provided First-Rate Representation
to the Settlement Class and California Subclass. ...................................... 15

     B.  The Settlement was the Result of Arms-length Negotiations and
Without Fraud or Collusion. .................................................................... 16

     C.  The Settlement is Favorable Given the Complexity, Expense,
and Likely Duration of the Litigation. ..................................................... 17

     D.  The State of Litigation and the Available Discovery ............................. 20

i

E.  The Settlement Terms Represent a Highly Favorable Compromise that Appropriately Balances the Merits of Plaintiffs' Claims and the Likelihood of Success with the Attendant Risks. ................................................. 21

F.  Class Counsel and Plaintiffs Believe that the Settlement is in the Class's Best Interests. ................................................................... 24

G.  The effectiveness of the proposed method of distributing relief to the Class supports approval of the Settlement. .................................. 25

H.  There is no agreement required to be identified under Rule 23(e)(3)..................... 25

I.  The Settlement Treats Settlement Class Members Equitably Relative to Each Other. ................................................................................ 26

J.  The Single Objection Lacks Merit. .......................................................... 27

VII.   THE COURT SHOULD CERTIFY THE SETTLEMENT CLASS FOR PURPOSES OF THE SETTLEMENT. ........................................................... 28

    1.  *Numerosity* ................................................................................ 29

    2.  *Commonality* ............................................................................. 29

    3.  *Typicality*.................................................................................. 30

    4.  *Adequacy of Representation* ........................................................ 31

    5.  *Common Legal and Factual Questions Predominate in This Litigation* ........ 32

    6.  *A Class Action is the Superior Means to Adjudicate Plaintiffs' Claims* ......... 33

VIII.  THE INDIVIDUAL AND DIRECT NOTICE PROVIDED TO CLASS MEMBERS IS THE BEST PRACTICABLE, MEETS DUE PROCESS CONSIDERATIONS, AND WEIGHS IN FAVOR OF FINAL APPROVAL. ................................... 34

    A.  The Court Should Appoint Undersigned Counsel As Class Counsel And The Named Plaintiffs As The Class Representatives....................................... 35

IX.   CONCLUSION........................................................................................ 36

## TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE(S)**

*Ahmad v. Old Republic Nat. Title Ins. Co.*,
   690 F.3d 698 (5th Cir. 2012) ................................................................. 32

*Al's Pals Pet Care v. Woodforest Nat'l Bank, NA*,
   No. H-17-3852, 2019 WL 387409 (S.D. Tex. Jan. 30, 2019).................................................. 13

*Amchem Prods. v. Windsor*,
   521 U.S. 591 (1997)................................................................... 29, 32

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
   568 U.S. 455 (2013)........................................................................ 32

*Assoc. for Disabled Am., Inc. v. Amoco Oil Co.*,
   211 F.R.D. 457 (S.D. Fla. 2002) ........................................................... 18

*Ayers v. Thompson*,
   358 F.3d 356 (5th Cir. 2004) .................................................... 18, 20, 21

*Browning v. Yahoo! Inc.*,
   No. C04-01463 HRL, 2007 WL 4105971 (N.D. Cal. Nov. 16, 2007)...................................... 27

*Carrera Aguallo v. Kemper Corp.*,
   No. 1:21-cv-01883 (N.D. Ill. Oct. 27, 2021) ............................................. 25

*Carson v. Am. Brands, Inc.*,
   450 U.S. 79 (1981).......................................................................... 20

*Cotton v. Hinton*,
   559 F.2d 1326 (5th Cir. 1977) ................................................... 14, 18, 24

*Crutchfield v. Sewerage & Water Bd. of New Orleans*,
   829 F.3d 370 (5th Cir. 2016) ............................................................... 32

*DeHoyos v. Allstate Corp.*,
   240 F.R.D. 292 (W.D. Tex. Feb. 21, 2007) ................................................ 20, 21, 24

*Eisen v. Carlisle & Jaquelin*,
   417 U.S. 156 (1974)........................................................................ 35

*Fehlen v. Accellion, Inc.*,
   No. 21-cv-01353 (N.D. Cal.) ............................................................... 19

*Fox v. Iowa Health Sys.*,
   No. 3:18-CV-00327-JDP, 2021 WL 826741 (W.D. Wis. Mar. 4, 2021)................................. 20

*Gen. Tel. Co. of the Northwest, Inc. v. EEOC*,
   446 U.S. 318 (1980)................................................................................................. 29

*Gordon v. Chipotle Mexican Grill, Inc.,*
   No. 17-cv-01415-CMA-SKC, 2019 WL 6972701 (D. Colo. Dec. 16, 2019)......................... 19

*Hammond v. The Bank of N.Y. Mellon Corp.*,
   No. 08 Civ. 6060(RMB)(RLE), 2010 WL 2643307 (S.D.N.Y. June 25, 2010)..................... 23

*Hays v. Eaton Grp. Attorneys, LLC*,
   No. 17-88-JWD-RLB, 2019 WL 427331 (M.D. La. Feb. 4, 2019) ........................................ 13

*In re Banner Health Data Breach Litigation*,
   No. 2:16-cv-02696-PHX (D. Az.)............................................................................... 19

*In re Combustion, Inc.*,
   968 F. Supp. 1116 (W.D. La. 1997).................................................................... 17, 21

*In re Corrugated Container Antitrust Litig.*,
   659 F.2d 1322 (5th Cir. 1981) ............................................................................. 21

*In re Deepwater Horizon*,
   739 F.3d 790 (5th Cir. 2014) ................................................................... 13, 29, 31

*In re Hannaford Bros. Co. Customer Data Sec. Breach Litig.*,
   293 F.R.D. 21 (D. Me. 2013).................................................................................... 23

*In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*,
   851 F. Supp. 2d 1055 (S.D. Tex. 2012) .......................................................... passim

*In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mex.*,
   910 F. Supp. 2d 891 (E.D. La. 2012)...................................................................... 13

*In re Talbert*,
   347 B.R. 804 (E.D. La. 2005)................................................................................. 29

*In re Yahoo! Inc. Customer Data Sec. Breach Litig.*,
   No. 16-MD-02752-LHK, 2020 WL 4212811 (N.D. Cal. July 22, 2020) ...................... 30, 33

*James v. City of Dallas*,
   254 F.3d 551 (5th Cir. 2001) ................................................................................. 30

*Jones v. Singing River Health Servs. Found.*,
   865 F.3d 285 (5th Cir. 2017) ................................................................................. 31

*Klein v. O'Neal, Inc.*,
    705 F. Supp. 2d 632 (N.D. Tex. 2010) ............................................................ passim

*Kostka v. Dickey's Barbeque Restaurants, Inc.*,
    No. 20-cv-3424 (N.D. Tex.) ............................................................................. 19

*Langbecker v. Elec. Data Sys. Corp.*,
    476 F.3d 299 (5th Cir.2007) ............................................................................ 30

*Liger v. New Orleans Hornets NBA Ltd. P'ship*,
    No. 05-1969, 2009 WL 2856246 (E.D.La. Aug. 28, 2009) ............................... 17

*M.D. ex rel. Stukenberg v. Perry*,
    675 F.3d 832 (5th Cir. 2012) ........................................................................... 29

*Manchaca v. Chater*,
    927 F. Supp. 962 (E.D. Tex. 1996) ................................................................... 15

*Mullane v. Central Hanover Bank & Trust Co.*,
    339 U.S. 306 (1950) ......................................................................................... 34

*Mullen v. Treasure Chest Casino, LLC*,
    186 F.3d 620 (5th Cir. 1999) ...................................................................... 29, 34

*ODonnell v. Harris Cnty., Texas*,
    No. CV H-16-1414, 2019 WL 4224040 (S.D. Tex. Sept. 5, 2019) ................. 13, 34

*Parker v. Anderson*,
    667 F.2d 1204 (5th Cir. 1982) ......................................................................... 21

*Petrovic v. Amoco Oil Co.*,
    200 F.3D 1140 (8th Cir, 1999) ......................................................................... 35

*Pettway v. Am. Cast Iron Pipe Co.*,
    576 F.2d 1157 (5th Cir. 1978) ...................................................................... 14, 24

*Pollard v. Remington Arms Co., LLC*,
    896 F.3d 900 (8th Cir. 2018) ............................................................................. 1

*Purdie v. Ace Cash Express, Inc.*,
    No. 301CV1754L, 2003 WL 22976611 (N.D. Tex. Dec. 11, 2003) ................... 13

*Reed v. General Motors Corp.*,
    703 F.2d 170 (5th Cir. 1983) .................................................................... passim

*San Antonio Hispanic Police Officers' Org., Inc. v. City of San Antonio*,
    188 F.R.D. 433 (W.D. Tex. 1999) ................................................................... 20

*Schulte v. Fifth Third Bank*,
   805 F. Supp. 2d 560 (N.D. Ill. 2011) .................................................... 27

*Sosna v. Iowa*,
   419 U.S. 393 (1975) ............................................................................... 31

*Spegele v. USAA Life Ins. Co.*,
   No. 5:17-CV-967-OLG, 2021 WL 4935978 (W.D. Tex. Aug. 26, 2021) ................................. 14

*Stott v. Capital Fin. Servs., Inc.*,
   277 F.R.D. 316 (N.D. Tex. 2011) .................................................... 24, 25

*Union Asset Mgmt. Holding A.G. v. Dell, Inc.*,
   669 F.3d 632 (5th Cir. 2012) .............................................................. 13

*Valley Drug Co. v. Geneva Pharms., Inc.*,
   350 F.3d 1181 (11th Cir. 2003) ........................................................... 31

*Wal-Mart Stores, Inc. v. Dukes, et al*,
   564 U.S. 338 (2011) ........................................................................ 29, 30

*Welsh v. Navy Fed. Credit Union*,
   No. 16-CV-1062-DAE, 2018 WL 7283639 (W.D. Tex. Aug. 20, 2018) ................................. 17

## **STATUTES**

California's Consumer Privacy Act, Cal. Civ. Code § 1798.150 .................................................... 3

California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.* ......................... 3

Maryland's Consumer Protection Act, Md. Comm. Code §§ 13-301, *et seq* ............................... 3

Maryland's Personal Information Privacy Act, Md. Comm. Code §§ 14-3501. *et seq.* ................. 3

Pennsylvania's Unfair Trade Practices and Consumer Protection Law,
   73 Pa. Cons. Stat. §§ 201-2 & 201-3, *et seq.* .................................................... 3

## **OTHER AUTHORITIES**

1 *Newberg on Class Actions* § 3.05, at 3–25 (3d ed. 1992) ......................................................... 29

*Manual for Complex Litigation*, § 21.632 (4th ed.) ............................................................... 29

Wright and A. Miller, *Federal Practice and Procedure* (1972) .................................................... 34

## **RULES**

Fed. R. Civ. P. 12(b)(6) ................................................................................ 23

Fed. R. Civ. P. 23 ................................................................................. passim

Fed. R. Civ. P. 23(a) ......................................................................... 29, 32

Fed. R. Civ. P. 23(a)(1) ........................................................................... 29

Fed. R. Civ. P. 23(a)(2) ........................................................................... 29

Fed. R. Civ. P. 23(a)(3) ........................................................................... 30

Fed. R. Civ. P. 23(a)(4) ........................................................................... 31

Fed. R. Civ. P. 23(b) ............................................................................... 32

Fed. R. Civ. P. 23(b)(3) .............................................................. 28, 32, 33

Fed. R. Civ. P. 23(b)(3)(C) ..................................................................... 34

Fed. R. Civ. P. 23(e) .................................................................. 14, 17, 34

Fed. R. Civ. P. 23(e)(2) .............................................................. 12, 13, 26

Fed. R. Civ. P. 23(e)(2)(A) ..................................................................... 15

Fed. R. Civ. P. 23(e)(2)(B) ............................................................... 16, 17

Fed. R. Civ. P. 23(e)(2)(C)(i) ........................................................... 20, 24

Fed. R. Civ. P. 23(e)(2)(C)(ii) ................................................................. 25

Fed. R. Civ. P. 23(e)(2)(D) ..................................................................... 26

Fed. R. Civ. P. 23(e)(3) ..................................................................... 12, 25

Fed. R. Civ. P. 23(g)(1) ........................................................................... 36

Fed. R. Civ. P. 56 .................................................................................... 23

## I.     INTRODUCTION

On March 21, 2022, this Court preliminarily approved a proposed class action settlement between Plaintiffs Jay Heath, Edward Shapiro, and Daisy Becerra Lopez, on behalf of themselves and all other persons similarly situated ("Plaintiffs"), and Defendants Insurance Technologies Corp ("ITC") and Zywave, Inc. ("Zywave") (collectively, "Defendants") and authorized the implementation of the notice plan described in the motion and declaration of the proposed notice administrator.  ECF 39. Class Counsel now moves for final approval. The settlement is fair, reasonable, and adequate. After the dissemination of notice, the Class overwhelmingly supports the settlement, with only 30 timely opt-outs out of over 4.3 million class members, and ***one*** objection (an objection that does not raise any valid grounds for denying final approval). The combination of direct mail notice and direct email notice (with an additional email reminder notice) was the best practicable under the circumstances and reached 88.2% percent of the Settlement Class. This meets any due process concerns, far exceeding the Federal Judicial Guideline of 70%. *See Pollard v. Remington Arms Co., LLC*, 896 F.3d 900, 906 (8th Cir. 2018) (reach of 73.7%, or possibly as low as 49% of class members, satisfied due process).

This Court should grant final approval, and also grant Plaintiffs' Motion for an Award of Attorneys' Fees, Reimbursement of Costs and Expenses, and Service Awards (ECF 42), for the reasons stated in the Memorandum in Support, and because there is no valid opposition to the settlement or the requested attorneys' fees, costs and expenses, and service awards.

## II.    CASE SUMMARY

### A.     **Factual Background**.

ITC is a provider of marketing, rating, and management software and services for insurance companies and agents. ITC sells its services and products across the United States. Declaration of

Gary Klinger in Support of Plaintiffs' Unopposed Motion for Preliminary Approval ("Klinger Decl."), ECF 35-1 ¶ 30.a. Defendant Zywave is an insurance technology provider focusing on cloud-based sales management, client delivery, content, and analytics solutions. Zywave acquired ITC in 2020 to expand its customer base to more than 15,000 insurance organizations globally. *Id.* ¶ 8.b. ITC is a wholly owned subsidiary of Zywave. *Id.* ¶ 30.c. In the ordinary course of doing business, Defendants receive sensitive PII regarding consumers such as: names; addresses; phone numbers; driver's license numbers; Social Security numbers; dates of birth; email addresses; genders; and usernames and passwords. *Id.* at ¶ 30.d.

On or about May 10, 2021, ITC began notifying consumers and state Attorneys General about a data breach that occurred on February 27, 2021 (the "Data Breach"). *Id.* at ¶ 30.f. According to the Notice of Data Breach letters and letters sent to state Attorneys General, "an unauthorized third party gained access to [ITC's] AgencyMatrix application," and "acquired certain personal information stored in that application." *Id.* ¶ 30.g. Hackers obtained information from ITC including PII of thousands of its clients' customers, potential customers, and other individuals, including, but not limited to, their names, Social Security numbers, driver's license numbers, dates of birth, and username/password information. *Id.* ¶ 30.i.

Plaintiffs and the Class Members allege that they relied on ITC to keep their PII confidential and securely maintained, to use this information for business purposes only and to make only authorized disclosures of this information. *Id.* ¶ 30.j. Through the Data Breach, hackers were able to gain access to and exfiltrate the protected PII of millions of Class Members. *Id.* ¶ 30.k. Plaintiffs allege the Data Breach put them, and other Class Members, at risk of imminent, immediate and continuing risk of harm from fraud and identity theft. *Id.* ¶ 34.

2

B.      **The Litigation**.

Following the investigation conducted by Class Counsel, Plaintiffs Jay Heath and Edward Shapiro filed their original Class Action Complaint on June 18, 2021, asserting causes of action for: (1) Negligence; (2) Negligence *Per Se*; (3) Violation of Maryland's Personal Information Privacy Act; (4) violation of Maryland's Consumer Protection Act; (5) violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law; (6) Declaratory Judgment; and (7) Unjust Enrichment. ECF 35-1 ¶ 32. Plaintiffs sought injunctive and equitable relief, an award of compensatory, statutory, nominal and punitive damages, reasonable fees and costs allowable by law, and any such further relief that the Court deems proper. *Id*. ¶ 33.

Soon after filing, the Parties began discussing the prospect for early resolution after an exchange of information necessary to evaluate the strengths and weaknesses of Plaintiffs' claims and ITC's defenses. *Id.* ¶ 35. In furtherance of settlement negotiations, and in accordance with the Court's Order granting the Parties' Joint Stipulation to Amend, on November 19, 2021, Plaintiffs filed their operative and First Amended Complaint, adding Plaintiff Daisy Becerra Lopez, a California Subclass, and an eighth and ninth cause of action: (8) violation of California's Consumer Privacy Act; and (9) violation of California's Unfair Competition Law. *Id*. ¶ 36.

C.      **Mediation and Settlement**.

To further facilitate settlement negotiations, the Parties agreed to mediate Plaintiffs' claims and those of the Class with Christopher Nolland. Mr. Nolland is a widely respected mediator with decades of experience working as a neutral, both in mediation and arbitration. *Id*. ¶ 37. In advance of mediation, ITC provided informal discovery related to the merits of Plaintiffs' claims and class certification, and ITC's defenses, and the Parties discussed their respective positions on the merits of the claims and class certification. *Id*. ¶ 38. The Parties also fully briefed their respective positions for the mediator. *Id*. This informal exchange of information, combined with Plaintiffs'

3

individual research, and the significant experience of Class Counsel in the largest data breach cases litigated in this country to date, allowed counsel to fully evaluate the strengths and weaknesses of Plaintiffs' case and that of the Class, and to conduct informed settlement negotiations. *Id*. ¶ 39.

On December 9, 2021 Counsel for Plaintiffs participated in a pre-mediation conference with Mr. Nolland. *Id*. ¶ 40. On December 13, 2021 the Parties attended a full-day mediation via Zoom Video Conference with Mr. Nolland. *Id*. ¶ 41. After a full day of arm's-length negotiations, and with the assistance of Mr. Nolland, the Parties agreed to a memorandum of understanding setting forth the essential terms of the Settlement Agreement. *Id*. ¶ 42. Over the next months, the Parties diligently drafted, negotiated, and finalized the Settlement Agreement, notice forms, and agreed upon a claims administrator. *Id*. ¶ 43.

### D.    Settlement Benefits.

The Settlement Agreement provides significant monetary relief. Defendants established a non-reversionary Settlement Fund of $11,000,000.00 to cover three separate tiers of class relief, attorneys' fees and costs, Plaintiffs' Service Awards (subject to Court approval), and the costs of settlement administration. ECF 35-1 ¶ 51. The Settlement provides for relief for the approximate 4,341,523 Members of the Settlement Class defined as follows:

> All individuals whose PII was potentially subjected to the Data Breach, as confirmed by Defendants' business records.

*Id*. ¶ 47. The Settlement Agreement provides additional relief for eligible Members of the California Subclass, defined as:

> All residents of California at the time of the Data Breach whose PII was potentially subjected to the Data Breach, as confirmed by Defendants' business records.

*Id*. ¶ 48. The California Subclass includes up to approximately 318,091 individuals. *Id*. ¶ 49. The Settlement Class specifically excludes the Court, the officers and directors of Defendants, persons who have been separately represented by an attorney and entered into a separate settlement

4

agreement in connection with the Data Breach, and persons who timely and validly request exclusion from the Settlement Class. *Id.* ¶ 50.

The three separate tiers of relief created by the Settlement include: (1) a "Tier One" fund providing for the payment of $100 to $300 for each California Subclass Member, subject to potential *pro rata* reduction; (2) a "Tier Two" fund providing for reimbursement of up to $5,000 of Out-of-Pocket expenses per Class Member, including payment for up to eight hours of attested lost time, compensable at the rate of $25 per hour; and (3) 12-months of Aura's Financial Shield® product, automatically provided to every Settlement Class Member. *Id.* ¶ 52. As described in detail below, the amounts designated for Tier One and Tier Two are in a way fungible: should the number and value of claims exceed the amount designated for a given Tier's fund, the residue from either fund will be transferred before the administrator resorts to any *pro rata* reduction. *Id.* ¶ 53.

1.    *Tier One Relief*

First, the Settlement created a tier ("the "Tier One Fund") of $1,590,400 ("the Tier One Maximum") to provide a statutory payment of $100 to each eligible Member of the California Subclass. *Id.* ¶ 54. If the total value of verified Tier One Claims submitted does not exceed the Tier One Maximum, then each verified Tier One claimant will have their Tier One payment of $100 increased on a *pro rata* basis up to a maximum of three hundred dollars ($300) subject to certain provisions described below. *Id.* ¶ 55.

The  determination  of whether the value of the amount of verified Tier One Claims does not exceed the Tier One Maximum will be made after a determination is made as to whether a Tier Two *pro rata* reduction of verified claims would be required (because the total value of such verified Tier Two claims exceeds the Tier Two Maximum), but before the transfer of funds from Tier One to Tier Two. *Id.* ¶ 56. In the event a *pro rata* reduction of the verified claims claimed by the Tier Two claimants would be necessary, but the total amount of verified Tier One Claims does

not exceed the Tier One Maximum, then such excess amounts in the Tier One Fund (the "Tier One Residue") shall be transferred by the Settlement Administrator to the Tier Two Fund up to the amount needed to pay in full the total value of verified Tier Two Claims without reducing each verified Tier One claim award below $100 per claim. Any Tier One residue remaining after a $100 award to each Tier One Claimant, and full payment of valid Tier Two claims, will be used to increase, *pro rata*, the amount paid to each valid Tier One claimant. *Id.* ¶ 57.

Any funds remaining in the Tier One Fund will not revert to ITC: the Settlement provides any remaining amount be paid to the Texas Bar Foundation, subject to Court approval, as a *cy pres* recipient. *Id.* ¶ 60.

### 2. Tier Two Relief

<u>Second</u>, the Settlement created a second tier ("the "Tier Two Fund") of $2,878,333 ("the Tier Two Maximum") to provide reimbursement of up to $5,000 per Class Member in Out-of-Pocket losses including compensation for lost time related to the Data Breach at the rate of $25 per hour for up to 8 hours per valid claimant from the National Class. *Id.* ¶ 61. If the total value of verified Tier Two Claims submitted does not exceed the Tier Two Maximum, then any amount remaining ("Tier Two Residue") shall be transferred by the Settlement Administrator to the Tier One Fund. *Id.* ¶ 62. If there are any funds remaining in the Tier Two Fund after the Tier Two Transfer (if any), then such funds shall be used to increase each verified Tier Two Claim on a *pro rata* basis. *Id.* ¶ 63. If the total amount of verified Tier Two Claims exceeds the Tier Two Maximum plus the Tier One Transfer (if any), payments to verified Tier Two claimants will be reduced on a *pro rata* basis. *Id.*

Out-of-Pocket losses are reimbursable if they are reasonably traceable, meaning: (1) the timing of the loss occurred on or after February 27, 2021; and (2) the personal information used to commit the purported identity theft or fraud consisted of the same type of personal information

6

that was provided to Defendants prior to the Data Breach. *Id*. ¶ 65. A Settlement Class Member's claim for Out-of-Pocket Losses may also include a claim for up to 8 hours of time spent remedying identity theft or fraud, including misuse of personal information, credit monitoring or freezing credit reports, and/or other issues related to the Data Breach at twenty-five dollars ($25.00) per hour. Independent documentation is not required: a Class Member can claim compensation for lost time by providing a simple attestation as to the amount of time spent ("Attested Time"). *Id*. ¶ 66.

Any funds remaining in the Tier Two Fund will not revert to ITC: the Settlement provides any remaining amount be paid to the Texas Bar Foundation as a *cy pres* recipient. *Id*. ¶ 67.

        *3.     Tier Three Relief*

<u>Third</u>, the Settlement provided for one-year of Aura Financial Shield® services to be automatically provided to Class Members. *Id*. ¶ 68.

Aura Financial Shield® focuses on protecting financial assets, freezing identity at ten (10) different Bureaus including the three main credit bureaus, home and property title monitoring, income tax protection and other services. This service is integrated with Early Warning Services ("EWS") to provide real-time monitoring of financial accounts. Financial Shield® also carries a $1 million policy protecting the subscriber. *Id*. ¶ 69. Aura Financial Shield® has a starting price of $12 per month per individual:[1] this relief is thus valued at $144 per Settlement Class Member. *Id*. ¶ 70.

All Class Members are eligible to access 12-months of Aura Financial Shield®, without the need to file a claim. *Id*. ¶ 71. The Settlement Administrator sent an activation code to each Settlement Class Member which can be used to activate the Services via an enrollment website maintained by Aura after the Effective Date. *Id*. ¶ 72. The enrollment codes were sent via the email

---

[1] *See* https://www.aura.com/pricing (last accessed July 13, 2022).

Notices, or via U.S. mail to those Class Members for whom Defendants did not have a good email address. *Id.* Aura shall provide Financial Shield to all Class Members who timely activate those services for a period of 12-months from the date of activation. *Id.*

###### E.  Preliminary Approval and Notice.

On March 21, 2022, this Court entered an Order granting preliminary approval of the Settlement. ECF 39. The Court found, upon a preliminary review, that "The terms of the Settlement, including its proposed releases, are preliminarily approved as within the range of fair, reasonable, and adequate, and are sufficient to warrant providing notice of the Settlement to the Settlement Class in accordance with the Notice Program." *Id.* at 4. The Court appointed Plaintiffs Jay Heath, Edward Shapiro, and Daisy Becerra Lopez as the Class Representatives for the Settlement Class, and appointed John A. Yanchunis and Ryan D. Maxey of Morgan & Morgan Complex Litigation Group; Gary E. Mason of Mason LLP; M. Anderson Berry of Clayeo C. Arnold, a Professional Law Corp.; Gary Klinger of Milberg Coleman Bryson Phillips Grossman, and Joe Kendall of Kendall Law Group, PLLC as Class Counsel. *Id.* at 3-4. The Court also approved the form and content of notice, which states the amount of fees and service awards that will be requested and approved the plan for disseminating notice to the Settlement Class. *Id* at 5.

Beginning on April 8, 2022, Court-approved notice was sent to the Settlement Class by Angeion Group. LLC. *See* Declaration of Ryan Chumley of Angeion Group, LLC, attached as Ex. A, ¶¶ 7-15. Class Members had until June 9, 2022, to file objections or to opt-out of the settlement. As of July 12, 2022, the Settlement Administrator has received only 30 requests for exclusion (out of a class of over 4.3 million), and **one** objection. See Chumley Declaration, Ex. A, ¶¶ 20-21.[2]

---

[2] The single pro se objection was sent to Class Counsel directly, not to Angeion.

III.     **THE NOTICE AND CLAIMS PROCESS.**

The notice and claims process was implemented pursuant to the Court's Preliminary Approval Order, as follows:

A.     **Class Notice.**

Angeion received the class data from Defendants on April 5, 2022, in a txt file with a total of 4,332,810 records. Ex. A. ¶ 4. After removing duplicates, the Class Member population (and the "Class List") consisted of 4,110,305 unique records. *Id.* at ¶ 5.

Beginning on April 8, 2022, Angeion caused the Email Notice to be sent to the 2,264,193 email addresses, of which 2,118,420 emails were delivered and 145,773 were not delivered due to either an invalid email address or a hard bounce. *Id*. ¶ 7.

Of the 4,110,305 unique Class Members, 1,485,822 Class Members did not have a valid email address provided with the class data or found in the reverse append process and 145,773 Class Members were sent an email notice that was not deliverable or otherwise pending delivery at the time of preparing the mailing notice file. *Id*. ¶ 9. Angeion was unable to discern with certainty the deliverability of the pending emails, and processed these 2,624,483 mailing addresses through the United States Postal Service ("USPS") National Change of Address ("NCOA") database to identify updated addresses for individuals and businesses who have moved in the last four years and filed a change of address card with the USPS. *Id*. ¶ 9. The NCOA results provided 117,591 updated addresses for the Class Members. Angeion updated the Class List with these updated addresses. *Id*. ¶ 9.

Beginning on April 20, 2022, Angeion caused the Settlement Postcard Notice ("Notice") to be mailed to all 2,624,483[3] Class Members whose Email Notice was either undeliverable or in unknown status[4] via United States Postal Service ("USPS") first class mail, postage prepaid. *Id*. ¶ 10.

In addition to the direct notice program, on June 21, 2022, Angeion implemented and commenced a supplemental social media notice campaign. *Id*.at ¶ 14. The social media program served 1,242,212 ad impressions to class members. *Id*.at ¶ 15

Through the direct Notice procedures outlined above (and not including the social media program), the Notice Program reached an estimated 88.2% of Class Members. *Id*. ¶ 13.

### B.      Case Specific Website and Hotline

On April 8, 2022, Angeion established the following website dedicated to this Settlement: www.ITCSettlement.com ("Settlement Website"). *Id*. ¶ 16. The Settlement Website contains an online portal where class members may submit a claim. *Id.* Additionally, the Long Form Notice, Claim Form, Settlement Agreement, Preliminary Approval Order and other settlement related documents are available for review and can be downloaded. *Id.* The Settlement Website also has a "Frequently Asked Questions" page which provides Class Members with answers to common inquiries about the Settlement, and a "Contact Us" page which provides Class Members with the mailing address, phone number and email address to contact the Settlement Administrator. *Id.* As of July 7, 2022, the Settlement Website has had 47,391 unique visitors and 128,757 page views. *Id*. ¶ 17.

---

[3] 1,846,112 records did not have an email address and 778,371 records had an email address that either was not deliverable or was not reporting as deliverable at the time of the mailing.

[4] As of April 26, 2022, 632,598 records of the 778,371 unknown emails were reported to be delivered and 145,773 of the 778,371 emails were reported to be undeliverable.  Wherefore, 632,598 records received both an email and postcard notice.

On April 8, 2022, Angeion established a toll-free hotline dedicated to this Settlement to further apprise Class Members of their rights and options in the Settlement: 1-855-944-3456. *Id.* ¶ 18. The toll-free hotline utilizes an interactive voice response ("IVR") system to provide Class Members with responses to frequently asked questions and provide essential information regarding the Settlement. Class Members may also leave a message for the Settlement Administrator, provide updated contact information or ask additional questions and Angeion will call them back. The hotline is accessible 24 hours a day, 7 days a week. *Id.* As of July 12, 2022, the case specific hotline has received 1,235 calls totaling 5,050 minutes. *Id.*

### C.    Class Response

Through the notice process, Class Members were given the means to make a claim, request exclusion, or object to the Settlement . As of July 12, 2022, Angeion had received only 30 requests for exclusion and *had not received any* objection to the settlement. *Id.* ¶ 14. Class Counsel received ***one*** objection to the Settlement , but that objection raises no valid basis for denying final approval. Declaration of Gary M. Klinger in Support of Plaintiff's Motion Final Approval, ("Klinger MFA Dec."), filed herewith as Ex. B, ¶¶ 4-5. As of July 12, 2022, Angeion has received 17,923 claim submissions. Ex. A ¶ 19.

### IV.    THE SETTLEMENT CLASS AND SUBCLASS

The proposed nationwide Settlement Class includes "all individuals whose PII was potentially subjected to the Data Breach, as confirmed by Defendants' business records." ECF 35-1, Klinger Decl. ¶ 47.  The "California Settlement Subclass" means "all residents of California at the time of the Data Breach whose PII was potentially subjected to the Data Breach, as confirmed by Defendants' business records." *Id.* ¶ 48.

## V.    LEGAL STANDARD.

The general standard for final approval of a proposed settlement of a class action under

Rule 23(e)(2) remains whether it is "fair, reasonable and adequate." To make that determination,

Rule 23(e)(2) provides the following factors:

> (2) ***Approval of the Proposal.*** If the proposal would bind class members, the court may approve it only after a hearing and only on finding that it is fair, reasonable, and adequate after considering whether:
>
> (A) the class representatives and class counsel have adequately represented the class;
>
> (B) the proposal was negotiated at arm's length;
>
> (C) the relief provided for the class is adequate, taking into account:
>
>> (i) the costs, risks, and delay of trial and appeal;
>>
>> (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
>>
>> (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
>>
>> (iv) any agreement required to be identified under Rule 23(e)(3); and
>
> (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).

Common-law criteria preceded the Rule 23 factors. In *Reed v. General Motors Corp.*, 703

F.2d 170, 172 (5th Cir. 1983), the Fifth Circuit laid out six factors for courts to consider in

determining the fairness, reasonableness, and adequacy of a proposed class settlement: (1) the

existence of fraud or collusion behind the settlement; (2) the complexity, expense, and likely

duration of the litigation; (3) the stage of the proceedings and the amount of discovery completed;

(4) the probability of the plaintiffs' success on the merits; (5) the range of possible recovery; and (6) the opinions of the class counsel, class representatives, and absent class members. *See Union Asset Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 639 n.11 (5th Cir. 2012) (quoting *Reed*, 703 F.2d at 172).

"Because the Rule 23 and case-law factors overlap, courts in this circuit often combine them in analyzing class settlements." *ODonnell v. Harris Cnty., Texas*, No. CV H-16-1414, 2019 WL 4224040, at *8 (S.D. Tex. Sept. 5, 2019); *see Hays v. Eaton Grp. Attorneys, LLC*, No. 17-88-JWD-RLB, 2019 WL 427331, at *9 (M.D. La. Feb. 4, 2019); *Al's Pals Pet Care v. Woodforest Nat'l Bank, NA*, No. H-17-3852, 2019 WL 387409, at *3 (S.D. Tex. Jan. 30, 2019); see also Fed. R. Civ. P. 23(e)(2) Committee Notes to 2018 amendments ("The goal of this amendment [to Rule 23(e)(2)] is not to displace any [circuit case-law] factor, but rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal.").

"When considering [Rule 23(e)(2)] factors, the court should keep in mind the strong presumption in favor of finding a settlement fair." *Purdie v. Ace Cash Express, Inc.*, No. 301CV1754L, 2003 WL 22976611, at *4 (N.D. Tex. Dec. 11, 2003). *See also In re Deepwater Horizon*, 739 F.3d 790 (5th Cir. 2014); *In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mex., on Apr. 20, 2010*, 910 F. Supp. 2d 891, 930-31 (E.D. La. 2012), aff'd sub nom ("Because the public interest strongly favors the voluntary settlement of class actions, there is a strong presumption in favor of finding the settlement fair, reasonable, and adequate.); *Klein v. O'Neal, Inc.*, 705 F. Supp. 2d 632, 650 (N.D. Tex. 2010) (There is a "strong presumption that an arms-length class action settlement is fair—especially when doing so will result in significant economies of judicial resources").

13

A "proposed settlement need not obtain the largest conceivable recovery for the class to be worthy of approval; it must simply be fair and adequate considering all the relevant circumstances." *Klein*, 705 F. Supp. 2d at 649. Indeed, because "compromise is the essence of a settlement," "the settlement need not accord the plaintiff class every benefit that might have been gained after full trial." *Pettway v. Am. Cast Iron Pipe Co.*, 576 F.2d 1157, 1214 (5th Cir. 1978); *see also Cotton v. Hinton*, 559 F.2d 1326 (5th Cir. 1977) ("The trial court should not make a proponent of a proposed settlement justify each term of settlement against a hypothetical or speculative measure of what concessions might have been gained; inherent in compromise is a yielding of absolutes and an abandoning of highest hopes."). Accordingly, "absent fraud, collusion, or the like, [courts] should be hesitant to substitute [their] own judgment for that of counsel." *Klein*, 705 F. Supp. 2d at 649.

"Nothing has occurred that would alter the Court's initial assessment that the Settlement is fair, reasonable, and adequate." *Spegele v. USAA Life Ins. Co.*, No. 5:17-CV-967-OLG, 2021 WL 4935978, at *3 (W.D. Tex. Aug. 26, 2021). In fact, the response of the Class Members to the Settlement (only 231 requests for exclusion and one objection out of a class of over 4.3 million Settlement Class and California Subclass members who were sent notice by first-class mail) further underscores that the Settlement is, in fact, fair, reasonable, and adequate. For these reasons, and for the additional reasons Class Counsel will show the Court below, the Court should grant the instant motion seeking final approval of this Settlement.

## VI.    THE PROPOSED SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE PURSUANT TO RULE 23(E) AND THE FIFTH CIRCUIT REED FACTORS.

The Settlement in these combined actions is fair, reasonable, and adequate under both the Rule 23(e) factors and the Fifth Circuit's *Reed* factors, and the Court should finally approve the settlement.

14

A. **Plaintiffs and Class Counsel Have Provided First-Rate Representation to the Settlement Class and California Subclass.**

Plaintiffs and Class Counsel have provided excellent representation for both the Settlement Class and California Subclass and satisfy the adequacy of representation factor under Rule 23(e)(2)(A). Plaintiffs have no conflicts of interest with other Class Members, are subject to no unique defenses, and they and their counsel have vigorously prosecuted and continue to vigorously prosecute this case on behalf of the Class. *See generally* Klinger Decl., ECF 35-1. Further, Class Counsel are experienced in the successful litigation and settlement of class action litigation, including data privacy cases. ECF 35-1, ¶¶ 4-24; *In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*, 851 F. Supp. 2d at 1055 (S.D. Tex. 2012) (adequacy satisfied where class counsel had "extensive experience representing consumers, and other plaintiff classes, in class-action litigation," including "experience representing consumer classes in similar data-breach cases"). Class Counsel also conducted a thorough investigation of the facts both before and during the course of the Litigation. This investigation allowed Class Counsel to better understand the key factual issues at the core of the Litigation in negotiating the Settlement, *i.e.*, they had a "full understanding of the legal and factual issues surrounding this case." *Manchaca v. Chater*, 927 F. Supp. 962, 967 (E.D. Tex. 1996).

Having completed their investigation and given the risks of no recovery at all, Class Counsel, together with Plaintiffs, settled this Litigation on a favorable basis to the Class without unduly prolonging it and without the expense and risk of a trial and any subsequent appeals. Accordingly, Plaintiffs and Class Counsel have adequately represented the Settlement Class, satisfying Rule 23(e)(2)(A).

**B.      The Settlement was the Result of Arms-length Negotiations and Without Fraud or Collusion.**

The Settlement should be approved under Rule 23(e)(2)(B) and the first *Reed* factor. As previously stated, before filing their respective Complaints, Class Counsel investigated the potential claims against Defendants, interviewed potential plaintiffs, and gathered information about the Data Breach and its potential impact on consumers. Thus, Class Counsel's appreciation of the merits of this case prior to settlement, and their extensive experience in litigating other class cases in this area of the law throughout the country, allowed them to engage in vigorous, arms-length negotiations with Defendants ITC and Zywave. *See In re Heartland Payment Sys.,* 851 F. Supp. 2d at 1064 (approving settlement because "[t]he parties have shown that they possessed sufficient information to gauge the strengths and weaknesses of the claims and defenses" despite the fact that only informal discovery was taken and the case settled at an early stage).

The parties engaged in extensive arm's-length negotiations overseen by experienced mediator Christopher Nolland. The negotiations included plaintiffs in other lawsuits filed in connection with the Data Breach. In anticipation of the mediation, Defendants provided information to Class Counsel related to the merits of Plaintiffs' claims and class certification, as well as ITC's defenses., ECF 35-1 ¶ 38. This informal exchange of information, combined with Plaintiffs' individual research, and the significant experience of Class Counsel, allowed counsel to fully evaluate the strengths and weaknesses of Plaintiffs' case, and to conduct informed settlement negotiations. *Id*. ¶ 39. On December 13, 2021, the Parties attended a full-day mediation via Zoom Video Conference with Mr. Nolland. *Id*. ¶ 41. After a full day of arm's-length negotiations, and with the assistance of Mr. Nolland, the Parties agreed to a memorandum of understanding setting forth the essential terms of the Settlement Agreement. *Id*. ¶ 42. The parties thereafter spent significant time negotiating the specific terms and language of the Settlement

16

Agreement through numerous phone calls and email exchanges, drafting notice forms, and agreeing on a Settlement Administrator. *Id.* ¶ 43.

"The involvement of a neutral or court-affiliated mediator or facilitator in those negotiations may bear on whether they were conducted in a manner that would protect and further the class interests." Comment to December 2018 Amendment to Fed. R. Civ. P. 23(e); *see also Welsh v. Navy Fed. Credit Union,* No. 16-CV-1062-DAE, 2018 WL 7283639, at *12 (W.D. Tex. Aug. 20, 2018) ("The Court may . . . presume that no fraud or collusion occurred between opposing counsel in the absence of any evidence to the contrary."). "The Court may presume that no fraud or collusion occurred between counsel, in the absence of any evidence to the contrary." *Klein*, 705 F. Supp. 2d at 651 (quoting *Liger v. New Orleans Hornets NBA Ltd. P'ship*, Civ. A. No. 05-1969, 2009 WL 2856246, at *3 (E.D.La. Aug. 28, 2009)). Here, not only is the Settlement the result of arm's-length negotiations as discussed above, but the matter of attorneys' fees was not discussed until after the class benefits were reached. ECF 35-1 ¶ 93. Thus, there is no threat of fraud or collusion affecting the fairness of the settlement negotiations. *See In re Heartland Payment Sys., Inc.*, 851 F. Supp. 2d at 1064 (citing *In re Combustion, Inc.*, 968 F. Supp. 1116, 1127 (W.D. La. 1997) ("Further, testimony was presented that the matter of attorneys' fees was not negotiated in conjunction with the settlement agreements but left for separate determination by the Court.")).

Given the arm's-length negotiations that resulted in the proposed Settlement and that there is no evidence of fraud or collusion, the Settlement is fair, reasonable, and adequate under Rule 23(e)(2)(B) and the second *Reed* factor. *See* Fed. R. Civ. P. 23(e)(2)(B); *Reed*, 703 F.2d at 172.

### C.   The Settlement is Favorable Given the Complexity, Expense, and Likely Duration of the Litigation.

There exists "an overriding public interest in favor of settlement, particularly in class actions that have the well-deserved reputation as being most complex." *Assoc. for Disabled Am.,*

17

*Inc. v. Amoco Oil Co.*, 211 F.R.D. 457, 466 (S.D. Fla. 2002) (citing *Cotton*, 559 F.2d at 1331).

"When the prospect of ongoing litigation threatens to impose high costs of time and money on the parties, the reasonableness of approving a mutually-agreeable settlement is strengthened." *Klein*, 705 F. Supp. 2d at 651 (citing *Ayers v. Thompson*, 358 F.3d 356, 369 (5th Cir. 2004)).  Here, Defendants repeatedly denied their liability and planned to file motions to dismiss.

By negotiating a Settlement at an early stage of the litigation, the parties ensured that Class Members will receive the substantial benefits described above while avoiding the risks and potential pitfalls of prolonged litigation. While confident in the strength of their claims, Plaintiffs and Class Counsel are also pragmatic and recognize the risks inherent in litigation of a complex Data Breach case. *See* ECF 35-1 ¶¶ 44-45.

The risks, expense, complexity, and likely duration of further litigation support final approval of the Settlement. *Id.*, ¶¶ 24, 45. Should the case proceed in litigation, Plaintiffs' claims could be dismissed or narrowed at the motion to dismiss stage, summary judgment, at trial, or on a subsequent appeal. Plaintiffs also face the risk that class certification could be denied or that key expert testimony could be excluded. *Id.* Defendants also contend Plaintiffs' damages models would be subject to challenge, as Defendants dispute whether Plaintiffs suffered any cognizable damages and whether any such damages are measurable on a class wide basis through a viable, common methodology. While Plaintiffs disagree with Defendants' contentions, they recognize each risk, by itself, could impede the successful prosecution of these claims at trial and in an eventual appeal—which would result in zero recovery for the Class. *Id.* And even if Plaintiffs prevailed at trial, any recovery could be delayed for years by an appeal. *Id.*

In contrast, the Settlement provides immediate and substantial benefits to approximately 4,341,523 Class Members —similar to or better than the relief and benefits obtained in other data

breach class actions—and on a much quicker timeline. For example, a recent proposed settlement in a data breach class action involving more than 3 million people settled for only $2.3 million. *See Kostka v. Dickey's Barbeque Restaurants, Inc*., Case No. 20-cv-3424, ECF 62 (N.D. Tex.); *see also, e.g., Fehlen v. Accellion, Inc.*, Case No. 21-cv-01353 (N.D. Cal.) (proposed settlement of $8.1 million for 9.2 million class members who had their Social Security Numbers compromised); Final Approval Order, *In re Banner Health Data Breach Litigation*, No. 2:16-cv-02696-PHX, ECF No. 198 (D. Az.) (up to $6 million claims-made settlement after 3 years of litigation where breach compromised names, Social Security numbers, and PHI of approximately 2.9 million class members).

This case is settling in its early stages; if the Settlement is not finally approved, the parties will likely need to litigate through multiple dispositive motions, a motion for class certification, a potential motion to decertify the class, and multiple *Daubert* motions, among other things. That process would likely take years to resolve and involve expensive expert discovery. Yet there is no guarantee lengthy litigation and expensive discovery would lead to greater benefits for Class Members. Instead, there would be multiple inflection points at which the Class Members' claims could be narrowed or dismissed. Moreover, the parties will bear the cost of this litigation if it continues. An early resolution, before both sides spend significant sums on litigation costs, is in the best interest of the Settlement Class.

In short, "settling now avoids the risks and burdens of potentially protracted litigation." *Ayers*, 358 F.3d at 369. While Plaintiffs strongly believe in the merits of their case, they also understand the risks of continued litigation. As a recent federal court decision noted:

> Data breach litigation is evolving; there is no guarantee of the ultimate result. *See Gordon v. Chipotle Mexican Grill, Inc.,* No. 17-cv-01415-CMA-SKC, 2019 WL 6972701, at *1 (D. Colo. Dec. 16, 2019) ("Data breach cases ... are particularly risky, expensive, and complex."). Plaintiffs also faced the risk that [defendant]

would successfully oppose class certification, obtain summary judgment on one or more of their claims, or win at trial or on appeal. Also, the cost for [defendant] and Plaintiffs to maintain the lawsuit would be high, given the amount of documentary evidence as well as the expert costs both parties would incur in the context of class certification, summary judgment, and trial. As such, the current Settlement strikes an appropriate balance between Plaintiffs' "likelihood of success on the merits" and "the amount and form of the relief offered in the settlement." *See Carson v. Am. Brands, Inc.*, 450 U.S. 79, 88 n.14 (1981).

*Fox v. Iowa Health Sys.*, No. 3:18-CV-00327-JDP, 2021 WL 826741, at *5 (W.D. Wis. Mar. 4, 2021). Thus, the Settlement should be finally approved under Rule 23(e)(2)(C)(i) and the second *Reed* factor. *See* Fed. R. Civ. P. 23(e)(2)(C)(i); *Reed*, 703 F.2d at 172.

### D.     The State of Litigation and the Available Discovery.

Under the third *Reed* factor, the key issue is whether "the parties and the district court possess ample information with which to evaluate the merits of the competing positions." *In re Heartland Payment Sys., Inc.*, 851 F. Supp. 2d at 1064 (quoting *Ayers*, 358 F.3d at 369). "A settlement can be approved under this factor even if the parties have not conducted much formal discovery." *Id.* (citations omitted). The "[s]ufficiency of information does not depend on the amount of formal discovery which has been taken because other sources of information may be available to show the settlement may be approved even when little or no formal discovery has been completed." *San Antonio Hispanic Police Officers' Org., Inc. v. City of San Antonio*, 188 F.R.D. 433, 459 (W.D. Tex. 1999). "The Court should consider all information which has been available to all parties." *DeHoyos v. Allstate Corp.*, 240 F.R.D. at 292 (W.D. Tex. Feb. 21, 2007).

Here, prior to mediation, ITC and Zywave shared with Class Counsel information about the scope of the Data Breach, the number of class members, and the Defendants' remedial efforts. Drawing on their significant and substantial experience in other data-breach class action litigation, Class Counsel were able to determine the Settlement's adequacy in relation to the probability of success on the merits were this litigation to continue. ECF 35-1 ¶ 26. Because the parties "possess

ample information with which to evaluate the merits of the competing positions," *Ayers*, 358 F.3d at 369, this factor also favors final approval of the proposed settlement. *See Reed*, 703 F.2d at 172.

> E.      **The Settlement Terms Represent a Highly Favorable Compromise that Appropriately Balances the Merits of Plaintiffs' Claims and the Likelihood of Success with the Attendant Risks.**

When evaluating a proposed class action settlement, "the most important factor is the [fourth *Reed* factor,] probability of plaintiffs' success on the merits." *Parker v. Anderson*, 667 F.2d 1204, 1209 (5th Cir. 1982). "[T]he Court must compare the terms of the settlement with the rewards the class would have been likely to receive following a successful trial." *DeHoyos*, 240 F.R.D. at 287 (W.D. Tex. 2007) (citing *Reed*, 703 F.2d at 172 (5th Cir. 1983)). At the same time, a district court "must not try the case in the settlement hearings because the very purpose of the compromise is to avoid the delay and expense of such a trial." *Reed*, 703 F.2d at 172 (internal quotation marks and alteration omitted). This factor favors approval of the settlement when the class's likelihood of success on the merits is questionable. *See In re Corrugated Container Antitrust Litig.*, 659 F.2d 1322, 1326-27 (5th Cir. 1981) (affirming district court's finding that this factor favored approving the settlement when the class faced major obstacles in establishing proof of liability and damages); *DeHoyos*, 240 F.R.D. at 290 ("Because the laws of numerous states may be relevant to individual class member claims, plaintiffs would apparently face a further significant challenge to certifying the class outside the settlement context."); *Combustion*, 968 F. Supp. at 1128 ("On the other hand, Plaintiffs will have very serious legal and evidentiary hurdles to meet in order to get their case to the jury.").

Similarly, the fifth *Reed* factor—the range of possible recovery—concerns "whether the range of possible recovery or the benefit of the settlement to plaintiffs outweighs the risks of proceeding through litigation." *DeHoyos*, 240 F.R.D. at 290-91. Both of these factors likewise weigh in favor of final approval.

21

This Settlement guarantees Class Members real relief for harms and protections from potential future fall-out from the Data Breach. All Class Members *automatically* received a code to enroll in 12-months of Aura Financial Shield®, a credit and identity protection service valued at $144 per person that focuses on protecting financial assets, freezing identity at 10 different Bureaus, home and property title monitoring, and income tax protection, and carries a $1 million policy protecting each subscriber. Klinger Decl. ¶¶ 68–71. All Class Members are eligible to submit a claim for up to $5,000 in reimbursements of Out-of-Pocket expenses and lost time related to the Data Breach. *Id.* ¶¶ 61–67. Lost time can be claimed for up to 8 hours at $25 per hour, with a simple attestation. *Id.* Also, California Subclass Members are eligible for a statutory payment of up to $300, depending on the claims rate. *Id.* ¶¶ 54–60.

The Settlement is similar to results obtained in other data breach cases, which include for instance:  *In re: CaptureRX Data Breach Litigation*, Master File No. 5:21-CV-00523-OLG (W.D. TX, San Antonio Division ECF 49 (June 23, 2022); *Culbertson, et al v. Deloitte Consulting LLP*, Case No. 1:20-cv-3962-LJL (S.D.N.Y. 2022) ($5 million common fund); *Carrera Aguallo v. Kemper Corp*., Case No. 1:21-cv-01883 (N.D. Ill. Oct. 27, 2021) (claims made settlement valued at over $17 million); *In re Sonic Corp. Customer Data Sec. Breach Litig*., 2019 U.S. Dist. LEXIS 135573, at *24 (N.D. Ohio Aug. 12, 2019) ($4,325,000 aggregate settlement amount); *Henderson V. Kalispell Regional Healthcare*, No. CDV 19-0761 (Montana Eighth Judicial District Court, Cascade County) (common fund of $4.2 million). In fact, the terms of this settlement far exceed most data breach settlements. *See, e.g., Mowery v. Saint Francis Healthcare Sys.*, No. 1:20-cv-00013-SPC (E.D. Mo. Dec. 22, 2020) (data breach settlement providing up to $280 in value to settlement class members in the form of: reimbursement up to $180 of out of pocket expenses and time spent dealing with the data breach; credit monitoring services valued at $100; and equitable

22

relief in the form of data security enhancements); *Baksh v. IvyRehab Network, Inc.*, No. 7:20-CV-01845 (S.D.N.Y. Jan. 27, 2021) (providing up to $75 per class member out-of-pocket expenses incurred related to the data breach and $20 reimbursement for lost time, with payments capped at $75,000 in aggregate; credit monitoring for claimants; and equitable relief in the form of data security enhancements); *Chacon v. Nebraska Med.*, No. 8:21-cv-00070 (D. Neb. Sept. 15, 2021) (data breach settlement providing up to $300 in ordinary expense reimbursements including to 6 hours of lost time at $20 per hour; up to $3,000 in extraordinary expense reimbursements; one-year of automatic credit monitoring; data security enhancements); *Chatelain v. C, L & W PLLC, d/b/a Affordacare Urgent Care Clinics*, No. 50742-A (Tex. 42d Dist. Ct. Taylor Cnty. Nov. 5, 2020) (data breach settlement providing 12-months of credit monitoring services and no expense reimbursements).

The value achieved through the Settlement is guaranteed, where chances of prevailing on the merits are uncertain. While Plaintiffs strongly believe in the merits of their case, they also understand that ITC asserts a number of potentially case-dispositive defenses. In fact, should litigation continue, Plaintiffs would likely have to immediately survive a motion to dismiss in order to proceed with litigation. Due at least in part to their cutting-edge nature and the rapidly evolving law, data breach cases like this one generally face substantial hurdles—even just to make it past the pleading stage. *See Hammond v. The Bank of N.Y. Mellon Corp.*, No. 08 Civ. 6060(RMB)(RLE), 2010 WL 2643307, at *1 (S.D.N.Y. June 25, 2010) (collecting data breach cases dismissed at the Rule 12(b)(6) or Rule 56 stage). Class certification is another hurdle that would have to be met—and one that been denied in other data breach cases. *See, e.g.*, *In re Hannaford Bros. Co. Customer Data Sec. Breach Litig.*, 293 F.R.D. 21 (D. Me. 2013).

Plaintiffs dispute the defenses ITC asserts—but it is obvious that their success at trial is far from certain. Through the Settlement, Plaintiffs and Class Members gain significant benefits without having to face further risk of not receiving any relief at all.

The inherent uncertainty in litigation—even where, as here, Plaintiffs are confident in their future success—presents a risk to Plaintiffs of expending time and money on this case with the possibility of no recovery at all for the Class. Even assuming success at trial, the case would likely continue with lengthy appeals. ECF 35-1, ¶ 24. The proposed Settlement avoids these uncertainties and provides the Settlement Class with immediate, meaningful, and certain monetary and injunctive relief. *Id.* Under the circumstances, Plaintiffs and Class Counsel appropriately determined that the Settlement outweighs the risks of continued litigation. *Id.* Accordingly, the Settlement should be finally approved under Rule 23(e)(2)(C)(i) and the fourth and fifth *Reed* factors. *See* Fed. R. Civ. P. 23(e)(2)(C)(i); *Reed*, 703 F.2d at 172.

**F.      Class Counsel and Plaintiffs Believe that the Settlement is in the Class's Best Interests.**

All Plaintiffs and Class Counsel firmly believe that this Settlement is fair, reasonable, and adequate, and in the best interests of Class Members, which is an important consideration in any class settlement analysis. ECF 35-1 ¶ 25. "The Fifth Circuit has repeatedly stated that the opinion of class counsel should be accorded great weight" when "evaluating a proposed settlement." *Klein*, 705 F. Supp. at 649 (citing *Pettway v. Am. Cast Iron Pipe Co.*, 576 F.2d 1157, 1216 (5th Cir. 1978)); *DeHoyos*, 240 F.R.D. at 292 ("The endorsement of class counsel is entitled to deference."); *see also Stott v. Capital Fin. Servs., Inc.*, 277 F.R.D. 316, 346 (N.D. Tex. 2011) ("As class counsel tends to be the most familiar with the intricacies of a class action lawsuit and settlement, 'the trial court is entitled to rely upon the judgment of experienced counsel for the parties.'") (quoting *Cotton*, 559 F.2d at 1330). Here, Settlement Class Counsel are all highly experienced in class

24

action litigation and were well positioned to evaluate the strengths and weaknesses of continued litigation, as well as the reasonableness of the Settlement. ECF 35-1 ¶ 4-24. They have collectively recovered hundreds of millions of dollars for class members in other litigation, including data breach cases. *See, e.g., Carrera Aguallo v. Kemper Corp.,* Case No. 1:21-cv-01883 (N.D. Ill. Oct. 27, 2021), ECF 33 (finally approving settlement valued at more than $17 million in data breach class action involving 6 million class members). Accordingly, the sixth *Reed* factor further supports approval of the proposed Settlement. *See Reed*, 703 F.2d at 172; *see also Stott v. Capital Fin. Servs., Inc.*, 277 F.R.D. 316, 346 (N.D. Tex. 2011) ("As class counsel tends to be the most familiar with the intricacies of a class action lawsuit and settlement, 'the trial court is entitled to rely upon the judgment of experienced counsel for the parties.'").

### G. The effectiveness of the proposed method of distributing relief to the Class supports approval of the Settlement.

Subject to Court approval, the Net Settlement Fund will be distributed pursuant to a proposed distribution formula set out in Section IV of the Settlement Agreement. ECF 35-2, pages 9-13. No residual funds will revert to Defendants. *Id.* at 12. Eligible claims will be paid electronically unless a Class Member requests to receive payment by written check. Settlement checks will be delivered by U.S. mail, first-class postage prepaid. *Id*. at page 50. All payments will be made approximately 45 days after all appeals and other reviews. *Id.* Given the simplified process for paying each Class Member and the fact that no funds will revert to Defendants, this factor weighs in favor of approval under Fed. R. Civ. P. 23(e)(2)(C)(ii).

### H. There is no agreement required to be identified under Rule 23(e)(3).

Under Rule 23(e)(3), "[t]he parties seeking approval must file a statement identifying any agreement made in connection with the proposal." There are no agreements between the Parties

here except those set forth or explicitly referenced in the Settlement Agreement. This factor is not relevant to whether the Settlement should be finally approved.

    **I.**    **The Settlement Treats Settlement Class Members Equitably Relative to Each Other.**

    The final factor, Rule 23(e)(2)(D), looks at whether Class Members are treated equitably. *See* Fed. R. Civ. P. 23(e)(2)(D). Here, the Settlement provided for a notice plan that is designed to reach as many Class Members as possible and provided Class Members with direct mail notice of the Settlement. *See* Section III(E), *supra*. It also informed Class Members of their right to object to, or opt out of, the Settlement. *Id.* All Class Members were eligible to make a claim for the same amount of Out-of-Pocket expense reimbursements and lost time. Moreover, all Class Members also *automatically* received a code for enrolling in 12 months of Aura Financial Shield® services. While California Subclass Members are eligible for an additional payment, such a payment was only available because they are eligible for additional statutory benefits that cover only residents of California. And, while Plaintiffs each seek a $2,000 award for their services on behalf of the Class, this award is *less than* one-half of the amount that any given Class Member can claim in reimbursements, and is justified by the benefits brought to the Class by the work of the Plaintiffs. Thus, the Settlement treats Class Members equitably relative to each other, satisfying Rule 23(e)(2)(D). *See* Fed. R. Civ. P. 23(e)(2)(D).

    Each factor identified under Rule 23(e)(2) and as required by the Fifth Circuit in *Reed* is satisfied. Given the litigation risks involved and the complexity of the underlying issues, the $11,000,000.00 recovery is a significant and meaningful result, designed to meet the types of repercussions sustained by Class Members following a data breach. It could not have been achieved without full commitment by Plaintiffs and Class Counsel.  Plaintiffs and Class Counsel

respectfully submit that the Settlement is fair, reasonable, and adequate, that it meets each of the Rule 23(e)(2) and *Reed* factors, and final approval should be granted.

### J.     The Single Objection Lacks Merit.

The objection of Ms. Michelle M. DeFranco (the "DeFranco Objection") is the only objection filed. The objection, conclusory in nature, seems to express Ms. DeFranco's belief that: A) lawyers should not "just be able to pick up a case and make a bunch of money off the things I've been through," and B) that "a few hundred $$" is not enough compensation for what she has been through. *See* ECF 43. However, an objection that simply argues that the amount awarded to a single Class Member should be increased, it is "tantamount to complaining that the settlement should be 'better,' which is not a valid objection." *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 595 (N.D. Ill. 2011), quoting *Browning v. Yahoo! Inc.*, No. C04-01463 HRL, 2007 WL 4105971, at *5 (N.D. Cal. Nov. 16, 2007). Also, Ms. DeFranco does not explain how or why an $11 million non-reversionary common fund, or the three tiers of compensation made available to this Settlement Class, is less than fair, reasonable, and adequate.

Ms. DeFranco also takes issue with the fact that she has "not met the people who say they represent me." Ms. DeFranco is not a client of Plaintiffs' Counsel here – she is a putative Class Member. It is never (or only rarely) the case that absent class members would meet Class Counsel, and Ms. DeFranco has not reached out directly to Class Counsel, other than to send copies of her putative objection to them. However, upon receipt of her objection, one of Class Counsel contacted Ms. DeFranco to discuss the issues raised in her objection and left a message to have her call him. Class Counsel left both his office number and cell phone number and requested that she call him. Class Counsel called a second time, and Ms. DeFranco answered, but said that she was in a Hobby Lobby store and that she would call back in 10 minutes. Ms. DeFranco did not call back.  As of

the filing of this motion, Class Counsel has been unable to substantively connect with Ms. DeFranco, despite best efforts to do so.

Ms. DeFranco also notes that she will "attach the evidence." What follows are a series of pages with handwritten notes that are indecipherable, that make no cogent argument, and that do not appear to establish any particular fact. Since these arguments in these handwritten notes are unintelligible, Plaintiffs are unable to respond and the Court should disregard them.

Finally, it is clear from the "objection" that Ms. DeFranco has had "the hardest year of her life." While Class Counsel is sympathetic to an individual who clearly has been having a rough go of things, a sympathetic objector with problems in her life is not a valid basis for an objection. Ms. DeFranco does not demonstrate how or why this Data Breach involving ITC and Zywave caused or contributed to cause the past year to the be the hardest of her life. She does not indicate how the "disruption" to her life from "extreme amounts of mail and visits from people who seem to be investigating me while I cut their hair" is related to this Data Breach. Nor does she indicate why this Settlement that benefits over 4.3 million people should not be finally approved, even if it doesn't fully address her "disruption." If Ms. DeFranco believes that she has legal claims for disruption that aren't fully compensated by the substantial relief offered by this Settlement, she should have opted-out and pursued her own individual claim.  The objection should be overruled.

VII.   **THE COURT SHOULD CERTIFY THE SETTLEMENT CLASS FOR PURPOSES OF THE SETTLEMENT.**

The Court previously concluded that it was appropriate to preliminarily certify the Settlement Class for settlement purposes only. See ECF 39, ¶ 4. Since preliminary approval, nothing has materially changed that should cause the Court not to finally certify this Settlement Class.  Because the Settlement Class meets the requirements for certification under Rule 23(b)(3), the Court should approve the Settlement Class and Subclass for purposes of judgment on the

Settlement. The Settlement Class also meets the requirements of Federal Rule of Civil Procedure 23 ("Rule 23"). *See Amchem Prods. v. Windsor*, 521 U.S. 591, 620 (1997); *Manual for Complex Litigation*, § 21.632 (4th ed.). The prerequisites for class certification under Rule 23(a) are numerosity, commonality, typicality, and adequacy—each of which is satisfied here.

>       1.      *Numerosity*

Rule 23 first requires that the class be so numerous that joinder of all members is impracticable. Fed. R. Civ. P. 23(a)(1). There is no specific threshold that must be surpassed in order to satisfy the numerosity requirement; rather, the determination "requires examination of the specific facts of each case and imposes no absolute limitations." *Gen. Tel. Co. of the Northwest, Inc. v. EEOC*, 446 U.S. 318, 330 (1980). That said, a showing that the class consists of more than forty members "should raise a presumption that joinder is impracticable." *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 624 (5th Cir. 1999) (quoting 1 *Newberg on Class Actions* § 3.05, at 3–25 (3d ed. 1992)); *see In re Talbert,* 347 B.R. 804, 808-809 (E.D. La. 2005) (finding numerosity requirement met when class potentially consisted of 88 members).

Here, the numerosity requirement is easily met. The Settlement Class consists of approximately 4,341,523 members. *See* ECF 35-2, Settlement Agr. Sec. III, 1.

>       2.      *Commonality*

Rule 23(a)(2)'s commonality requirement demands that "there are questions of law or fact common to the class." *Wal-Mart Stores, Inc. v. Dukes, et al,* 564 U.S. 338, 368 (2011) (citing Fed. R. Civ. P. 23). "The principal requirement of [*Dukes*] is merely a single common contention that enables the class action 'to generate common *answers* apt to drive the resolution of the litigation.'" *In re Deepwater Horizon*, 739 F.3d 790, 811 (5th Cir. 2014) (citing *M.D. ex rel. Stukenberg v. Perry,* 675 F.3d 832, 840 (5th Cir. 2012)). "These 'common answers' may indeed relate to the injurious effects experienced by the class members, but they may also relate to the defendant's

injurious conduct." *Id.* Regardless, "a *single* common question will do." *Id.* (citing *Dukes*, 564 U.S. at 359) (emphasis added) (alterations in original).

The commonality requirement is easily satisfied here. All Class Members' claims turn on whether Defendants' security environment was adequate to safeguard Class Members' PII. Thus, common questions include, *inter alia*, whether ITC failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of information compromised in the Data Breach; whether ITC's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations; and whether ITC's conduct rose to the level of negligence. *See, e.g.*, *In re Heartland Payment Sys.*, 851 F. Supp. 2d at 1054 ("The common factual question in this case is what actions Heartland took before, during, and after the data breach to safeguard the Consumer Plaintiffs' financial information."); *In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, No. 16-MD-02752-LHK, 2020 WL 4212811, at *3 (N.D. Cal. July 22, 2020) (common questions of whether defendant employed sufficient data security measures, knew of inadequacies, and timeliness of data breach disclosure satisfy commonality requirement).

### 3. *Typicality*

Rule 23(a)(3) "requires that the named representatives' claims be typical of those of the class." *Langbecker v. Elec. Data Sys. Corp.*, 476 F.3d 299, 314 (5th Cir.2007). Here, Plaintiffs' claims are typical of Class Members' claims because they arise from the same course of alleged conduct and are premised on the same legal theory. Plaintiffs had PII that was stored on Defendants' systems and that was compromised in the Data Breach, and so they suffered the same injury, were harmed by the same inadequate data security, and seek to assert the same underlying claims as the rest of the Class. *See James v. City of Dallas*, 254 F.3d 551, 571 (5th Cir. 2001) ("[T]he critical inquiry is whether the class representative's claims have the same essential

30

characteristics of those of the putative class. If the claims arise from a similar course of conduct and share the same legal theory, factual differences will not defeat typicality.").

### 4.    *Adequacy of Representation*

The Court should also easily conclude that "the representative parties will fairly and adequately protect the interests of the class," as required by Rule 23(a)(4). This requirement is satisfied when (i) there are no substantial conflicts of interest between the class representatives and the class; and (ii) the representatives and their attorneys will properly prosecute the case. *Sosna v. Iowa*, 419 U.S. 393, 403 (1975); *see also Jones v. Singing River Health Servs. Found.*, 865 F.3d 285, 294 (5th Cir. 2017). The existence of minor conflicts of interest between the plaintiffs and the class "alone will not defeat a party's claim to class certification: the conflict must be a 'fundamental' one going to the specific issues in controversy." *In re Deepwater Horizon*, 739 F.3d 790, 813 n.99 (5th Cir. 2014) (quoting *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003)). Both prongs are satisfied here.

Plaintiffs adequately represent the Settlement Class, as they have no conflicts of interest with other Class Members, are subject to no unique defenses, and they and their counsel have and continue to vigorously prosecute this case on behalf of the Settlement Class. Further, Class Counsel are experienced in the successful litigation and settlement of class action litigation, including data privacy cases. *See* ECF 35-1 ¶¶ 4–27; MLK Firm Resume at Klinger Decl., Ex. B1; Decl. of M. Andersen Berry at Klinger Decl., Ex. B2; Decl. of John Yanchunis at Klinger Decl., Ex. B3; Decl. of Joe Kendall at Klinger Decl. Ex. B4; s*ee id.*; *In re Heartland Payment Sys.*, 851 F. Supp. 2d at 1055 (adequacy satisfied where class counsel had "extensive experience representing consumers, and other plaintiff classes, in class-action litigation," including "experience representing consumer classes in similar data-breach cases").

The Settlement Class also meets the demands of Rule 23(b)(3). "In addition to satisfying Rule 23(a)'s prerequisites, parties seeking class certification must show that the action is maintainable under Rule 23(b)(1), (2), or (3)." *Amchem Prods.*, 521 U.S. at 614. Plaintiffs seek class certification under Rule 23(b)(3), which requires "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

### 5.   *Common Legal and Factual Questions Predominate in This Litigation*

Common legal and factual questions predominate in this Litigation relating to the Data Incident and related allegations. The predominance inquiry under Rule 23(b)(3) tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation. *Ahmad v. Old Republic Nat. Title Ins. Co.*, 690 F.3d 698, 702 (5th Cir. 2012). Rule 23(b)(3), however, does not require a plaintiff seeking class certification to prove that each element of the claim is susceptible to class wide proof. *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 469 (2013). Rather, it does require that common questions predominate over any questions affecting only individual class members. *Id.* "A common question is one where the same evidence will suffice for each member to make a *prima facie* showing or the issue is susceptible to generalized, class-wide proof." *Crutchfield v. Sewerage & Water Bd. of New Orleans*, 829 F.3d 370, 376 (5th Cir. 2016) (citations and quotations omitted).

Here, for settlement purposes, the central common questions predominate over any questions that may affect individual Class Members. The central common questions include whether Defendants owed a duty to Plaintiffs and Class Members, whether Defendants breached their duty, and whether Defendants failed to reasonably protect Class Members' PII. These issues are subject to "class wide proof" and "outweigh those issues that are subject to individualized

32

proof." "When one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Id.* (citations and quotations omitted). Courts have found similar settlement classes to meet the preponderance requirement in data breach cases. "Indeed, the focus on a defendant's security measures in a data breach class action is the precise type of predominant question that makes class-wide adjudication worthwhile." *In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, No. 16-MD-02752-LHK, 2020 WL 4212811, at *7 (N.D. Cal. July 22, 2020) (quotation marks omitted) (collecting cases). The Settlement Class and California Settlement Subclass meet the predominance requirement for settlement purposes, and certification will meet the objective of Rule 23(b)(3) to promote economy and efficiency of time, effort, and expense over separate suits.

### 6.    A Class Action is the Superior Means to Adjudicate Plaintiffs' Claims

The Court should find that the class action is the superior means of adjudication under Rule 23(b)(3). Each of the Rule 23(b)(3) factors, below, weigh in favor of finding superiority:

> (A)  the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B)  the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C)  the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D)  the likely difficulties in managing a class action.

All of these factors favor class treatment in this case. The value of each  Class Members' claim is relatively so much smaller than the cost it would take to litigate individual actions. Thus, Class Members would not individually be able seek redress in this matter in an economically

feasible manner. It is desirable to concentrate the litigation of the claims into the present forum in view of the scale of the class under Rule 23(b)(3)(C). With over 4.3 million class members, a class action would be superior to individual adjudication. *See Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 627 (5th Cir. 1999) (comparing a class that would consist of hundreds, instead of millions, of members).

Therefore, because the proposed Class satisfies the requirements for class certification, the Court should certify the Settlement Class for purposes of judgment on the Settlement

## VIII.   THE INDIVIDUAL AND DIRECT NOTICE PROVIDED TO CLASS MEMBERS IS THE BEST PRACTICABLE, MEETS DUE PROCESS CONSIDERATIONS, AND WEIGHS IN FAVOR OF FINAL APPROVAL.

Because an action maintained as a class suit under Rule 23 has *res judicata* effect on all members of the class, due process requires that notice of a proposed class settlement be provided to settlement class members. The notice provided must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314 (1950). In addition, the notice must convey the required information and allow a reasonable time for those interested in making an appearance to do so. The mechanics of the notice process are left to the broad discretion of the court. Wright and A. Miller, *Federal Practice and Procedure,* at 237 (1972). "There are no rigid rules to determine whether a settlement notice to the class satisfies constitutional or Rule 23(e) requirements." *ODonnell*, No. CV H-16-1414, 2019 WL 4224040, at *26. Instead, a settlement notice need only satisfy the broad reasonableness standards imposed by due process. Id. (citations and quotation marks omitted).

Here, Angeion attempted to provide notice via a combination of email and direct U.S. mail to 4,110,305 Class Members. Ex. A ¶ 5. This notice was the best practicable under the circumstances. It was clear, concise, and pointed each Class Member to the resources necessary

for them to get additional information, review pleadings, make a claim, request exclusion, object, or to reach class counsel should they have any additional questions. ECF 35-2, Exs. 1-2. The United States. Supreme Court has specifically held that individualized notice by mail to the last known address is the "best notice practicable" in a class action context. *Eisen v. Carlisle & Jaquelin,* 417 U.S. 156, 174-77 (1974). In contrast with notice via publication, providing individualized mail notice to Class Members—coupled with the Settlement Administrator's efforts to search for, locate, and confirm current information for Class Members—*ensures* that Class Members are provided with the best practicable notice of the Settlement, and the opportunity to make a claim, opt-out, or object. Courts regularly approve the use of mail to directly notify potential class members of a class action settlement. *Petrovic v. Amoco Oil Co.,* 200 F.3D 1140, 1153 (8th Cir, 1999). The Settlement Website, toll-free phone number, and email contact form provided additional forums for Class Members to access information about the Settlement and relevant filings. The Notice program satisfies the requirements of both Rule 23 and due process.

As outlined above, the notice program here was a successful one, with a reach of 88.2%. Ex. A. ¶ 13.  This successful notice program meets due process considerations, and weighs in favor of final approval of this Settlement.

A.    **The Court Should Appoint Undersigned Counsel As Class Counsel And The Named Plaintiffs As The Class Representatives.**

The Court preliminarily appointed John A. Yanchunis and Ryan D. Maxey of Morgan & Morgan Complex Litigation Group; Gary E. Mason of Mason LLP; M. Anderson Berry of Clayeo C. Arnold, a Professional Law Corp.; Gary Klinger of Milberg Coleman Bryson Phillips Grossman, and Joe Kendall of Kendall Law Group, PLLC as Class Counsel. ECF 39 at ¶ 6. Upon the Court's certification of the Settlement Class for purposes of entry of judgment on the Settlement, Plaintiffs request that these counsel be appointed Class Counsel for the Settlement

Class under Rule 23(g)(1). In addition, because Plaintiffs Jay Heath, Edward Shapiro, and Daisy Becerra Lopez have diligently and successfully fulfilled their responsibilities as the representatives of the class as initially certified and the proposed Settlement Class, the Court should appoint them as the Class Representatives.

## IX.   CONCLUSION

Class Counsel, with the help of Plaintiffs, obtained significant benefits to class members during a time where the law surrounding data breaches is evolving and remains uncertain. The Class Members were provided direct and individual notice of the Settlement and given additional resources by which they could and can get more information about the Settlement Agreement. No Class Members have objected to either the Settlement or to Plaintiffs' request for attorneys' fees, costs, and service awards. For these reasons, for the reasons for class certification and appointment of Plaintiffs and Class Counsel set forth in Plaintiffs' Memorandum in Support of Motion for Preliminary Approval (ECF 35), and because the Settlement is fair, reasonable, and adequate, Plaintiffs request this Court grant their motion for final approval following the Fairness Hearing on September 7, 2022, and grant the motion for attorneys' fees, costs, and litigation expenses and service awards (ECF 42).

Date: July 19, 2022

*/s/ Gary M. Klinger*
Gary M. Klinger**
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Phone: 866.252.0878
gklinger@milberg.com

Joe Kendall
**KENDALL LAW GROUP, PLLC**
3811 Turtle Creek Blvd., Suite 1450
Dallas, TX 75219
Telephone: 214-744-3000
Facsimile: 214-744-3015
jkendall@kendalllawgroup.com

M. ANDERSON BERRY**
**CLAYEO C. ARNOLD,**
**A PROFESSIONAL LAW CORP.**
865 Howe Avenue
Sacramento, CA 95825
Telephone: (916) 239-4778
Facsimile: (916) 924-1829
aberry@justice4you.com

Gary E. Mason**
Danielle L. Perry**
**MASON LLP**
5101 Wisconsin Avenue NW, Suite 305
Washington, DC 20016
Telephone: (202) 429-2290
Facsimile: (202) 429-2294
dperry@masonllp.com
gmason@masonllp.com

JOHN A. YANCHUNIS
Texas Bar No. 22121300
RYAN MAXEY*
**MORGAN & MORGAN**
**COMPLEX LITIGATION GROUP**
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
Telephone: (813) 559-4908
Facsimile: (813) 222-4795
jyanchuins@forthepeople.com
rmaxey@forthepeople.com

David Lietz**
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
5335 Wisconsin Ave. NW, Suite 440
Washington DC  20015
Phone: (847) 208-4585
Fax:  202-686-2877
dlietz@milberg.com

37

*Attorneys for Plaintiffs and the Class*

*\*Pro hac vice forthcoming*
*\*\*Admitted pro hac vice*

## CERTIFICATE OF SERVICE

I hereby certify that on this 19Th day of July, 2022, I caused a true and correct copy of the foregoing document to be filed with the Clerk of the Court for the Northern District of Texas via the Court's CM/ECF system, which will send notification of such filing to the counsel of record in the above-captioned matters.

Date: July 19, 2022                          */s/ Gary M. Klinger*

38